RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

DARRYL M. DURR,

　　　　　　　　*Petitioner-Appellant,*

　　　　*v.*

BETTY MITCHELL, Warden,

　　　　　　　　*Respondent-Appellee.*

No. 00-3353

>

—————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 96-00792—Donald C. Nugent, District Judge.

Argued: April 26, 2006

Decided and Filed: May 18, 2007

Before: SUHRHEINRICH, BATCHELDER, and COLE, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Kathleen A. McGarry, McGARRY LAW OFFICE, Glorieta, New Mexico, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Kathleen A. McGarry, McGARRY LAW OFFICE, Glorieta, New Mexico, Dennis Lyle Sipe, BUELL & SIPE CO. L.P.A., Marietta, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

　　　　SUHRHEINRICH, J., delivered the opinion of the court, in which BATCHELDER, J., joined. COLE, J. (p. 21), delivered a separate concurring opinion.

—————————

## OPINION

—————————

　　　　SUHRHEINRICH, Circuit Judge. Petitioner-Appellant Darryl Durr, an Ohio death row inmate, appeals from the order of the United States District Court for the Northern District of Ohio, Eastern Division, denying his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. On appeal, Durr challenges the district court's: (1) procedural default rulings; (2) denial of his Sixth Amendment claim that the trial court failed to appoint an independent psychologist; (3) denial of his ineffective assistance of counsel claim; and (4) denial of the sufficiency of evidence claim. For the reasons that follow, we **AFFIRM** the opinion of the district court denying Durr's petition for a writ of habeas corpus.

1

## I. Background

## A. Facts

On direct appeal, the Ohio Supreme Court made the following findings of fact:

> On January 31, 1988, at approximately 10:50 p.m., Norma Jean O'Nan and her husband returned to their home in Elyria and discovered the front door unlocked, the lights and television on, and their sixteen-year-old daughter, Angel Vincent, missing. Only twenty minutes earlier, Mrs. O'Nan had spoken with her daughter by telephone to learn that Angel's girlfriend, Deborah Mullins, was at her home and that Deborah's boyfriend, appellant Darryl Durr, was expected to arrive later in the evening. That was the last chance Mrs. O'Nan would have to speak to her daughter alive.

Mrs. O'Nan testified that Angel was wearing a hot pink sweater, a light pink and white checkered blouse, hot pink pants, and white tennis shoes when she and her husband left Angel home alone on the evening of January 31, 1988. After notifying the Elyria Police of Angel's disappearance, Mrs. O'Nan searched her home to determine if any of Angel's belongings were missing. Although Angel's pink pants were found, Mrs. O'Nan's search revealed the following items missing: an old lavender blanket with a hole in the center, a pair of black acid-washed denim jeans, Angel's pink and white checkered blouse, light blue eyeglasses that Angel wore only in her home, a jean jacket that Angel had borrowed from a friend, an Avon necklace with an "A" charm attached, a small chain bracelet, an Avon slip-on bracelet, an inexpensive rhinestone ring and a dog chain that hung from her mirror. Mrs. O'Nan also discovered Angel's handbag stuffed under her bed.

> Three or four days later, Mrs. O'Nan confronted Deborah Mullins and the appellant regarding the disappearance of her daughter, and was told by the appellant that "you know how kids are, she probably ran away."

> On April 30, 1988, three boys noticed a foul odor coming from two orange traffic barrels while playing in Brookside Park. The barrels and been placed open end to open end, and were underneath a railroad tie. Upon separating the barrels, the boys discovered a severely decomposed female body that had been wrapped in a dirty old blanket. A portion of a leg was visible through a large hole in the blanket.

> A deputy coroner testified that the only clothing found on the victim was a pink sweater and a pair of white tennis shoes. The pink sweater had been pushed up well above the victim's breast area. An initial external examination determined the body to be that of a young white female, who was in an advanced state of decomposition. The body was heavily infested with maggots and the body's eyes and ears had been lost. There was also prominent evidence of animal activity about the inguinal and vulval regions of the body, and in and about the thighs. According to the deputy coroner, the decomposition was consistent with three months exposure.

> After examining the body, the deputy coroner concluded that the cause of death was homicidal violence. Since the body was so badly decomposed, the deputy coroner could not determine whether ligature marks, scrapes or tears indicating strangulation were present. There was no damage noted to the internal cartilaginous structures of the neck. The deputy coroner declined, however, to rule out strangulation as a cause of death since damage to these structures is not always present in young strangulation victims due to the flexibility of these structures. In

addition, because the body was so severely infested with bacteria, testing for the presence of acid phosphates and spermatozoa was inconclusive.

In September, 1988, after appellant was arrested for two unrelated rapes, Deborah Mullins revealed her knowledge of Angel's disappearance to the Cleveland Police Department. As the result of her information, an ankle X-ray obtained from Elyria Memorial Hospital, and dental records, the body discovered in Brookside Park was determined to be that of Angel Vincent.

At trial, Deborah Mullins testified that on the evening Angel disappeared Deborah had asked the appellant to drive to the house of one of Angel's friends to retrieve a package of cigarettes for Angel. Appellant agreed and left. Shortly thereafter, appellant returned to Deborah's house and, instead of entering through the front door, began throwing stones at her upstairs bedroom window and blew his car horn for her to come out. Deborah and her baby, who had been fathered by the appellant, left the house and entered the appellant's car where the appellant brandished a knife toward both of them.

As the appellant was driving, Deborah heard noises from the back seat and after turning around discovered Angel bound on the rear floorboard.

According to Deborah's testimony, Angel was wearing black acid-washed denim jeans, a jean jacket, and tennis shoes when she was last seen in the back of appellant's car.

When Deborah asked the appellant why Angel was bound in his car, the appellant responded that he intended to "waste" her because "she would tell." He never revealed just what Angel was going to tell.

After threatening the life of both Deborah and his baby, the appellant let Deborah out of his car. He returned to her home three or four hours later. Upon returning, appellant told Deborah that he had "wasted" Angel and that she should pack her things because they were leaving.

Appellant drove Deborah and their baby to his wife's, Janice Durr's, Cleveland apartment. After dropping Deborah and the baby off, the appellant left with a duffle bag containing two shovels.

When appellant returned, he was wet and covered with snow. Upon entering the room, appellant placed a ring and bracelet that belonged to Angel on a coffee table. As he was falling asleep, appellant told Deborah that he had strangled Angel with a dog chain until she "pissed, pooped and shit and made a few gurgling sounds," took her body to a park, wrapped it in a blanket, placed it between two construction cones, and left her by some railroad tracks.

Later that day or the next day, appellant burned a bag of clothing in the basement of Janice Durr's apartment building and asked Deborah to model the black acid-washed jeans that Angel had worn on the evening of her abduction.

The appellant then drove Deborah, Janice Durr and his children to the west side of Cleveland where he burned another bag of items, and while driving from Cleveland toward Elyria, the appellant threw Angel's jean jacket out the car window.

After arriving at Deborah's home in Elyria, Deborah's mother informed her that Mrs. O'Nan had come over and inquired about Deborah's knowledge of Angels's disappearance. Deborah testified that appellant threatened her and their baby's life and instructed her to tell Mrs. O'Nan that Angel had been talking about running away. Deborah also testified that the appellant took her and their baby to Edgewater Park where the appellant threw Angel's glasses over a cliff into the lake. A month or so later, while driving past the Cleveland Zoo, appellant pointed to a location and said, "Over there." When Deborah questioned his statement, the appellant replied, "You know what I am talking about."

*State v. Durr,* 568 N.E.2d 674, 676-78 (Ohio 1991).

Following a jury trial, Durr was convicted of aggravated murder, in violation of Ohio Rev. Code § 2903.01; kidnaping, in violation of § 2905.01; aggravated robbery, in violation of § 2911.01; and rape, in violation of § 2907.02. The trial court followed the jury's recommendation and sentenced Durr to death. On direct appeal, the Ohio Court of Appeals affirmed Durr's conviction and sentence, *see State v. Durr*, No. CR-231670, 1989 WL 147626 (Ohio Ct. App. Dec. 7, 1989) (unpublished opinion), as did the Ohio Supreme Court, *see Durr*, 568 N.E.2d 674, *cert. denied,* 502 U.S. 912 (1991). Durr next sought post-conviction relief in state court, raising fifty claims. After the trial court denied his request, *State v. Durr*, No. CR-231670 (Ohio Ct. Com. Pl. July 6, 1993) (unpublished opinion), Durr appealed to the Ohio Court of Appeals, which affirmed the trial court, *State v. Durr*, No. 65958, 1994 WL 463813 (Ohio Ct. App. Aug. 25, 1994) (unpublished opinion). The Ohio Supreme Court denied Durr's request for further appeal. *See State v. Durr*, 644 N.E.2d 1028 (Ohio 1995). The Ohio Court of Appeals also denied his motion for delayed reconsideration, *State v. Durr*, No. 57140 (Ohio Ct. App. July 6, 1994) (unpublished opinion), and the Ohio Supreme Court subsequently affirmed that decision, *State v. Durr*, 643 N.E.2d 1147 (Ohio 1994). Durr also filed two additional motions for reconsideration in the Ohio Supreme Court, both of which were denied. *See State v. Durr*, 647 N.E.2d 493 (Ohio 1995).

In June 1996, Durr filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio, Eastern Division, asserting fifty-one claims for relief. The district court denied habeas relief as to all fifty-one claims, and further found no basis upon which to issue a certificate of appealability. This Court granted a certificate of appealability as to three issues: First, whether the district court correctly held that habeas claims forty-two (trial court's failure to appoint an independent psychologist), and fifty (ineffective assistance of counsel), were procedurally defaulted. Second, if not procedurally defaulted, whether these claims were properly denied on the merits. Third, whether the evidence of rape was insufficient to support Durr's rape conviction.

## II. Standards of Review

Durr filed his habeas petition after April 24, 1996,and it is therefore governed by the requirements of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

Under the AEDPA, a federal court may not grant a writ of habeas corpus unless it concludes that the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Deferential review under AEDPA applies only where the state court has adjudicated a claim on the merits. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)). When the state court has not assessed the merits of a claim properly raised in

a habeas petition, the deference due under AEDPA does not apply. *Id.* In that case, this Court reviews questions of law and mixed questions of law and fact de novo. *Id.*

In an appeal from a denial of habeas relief under the AEDPA, this Court reviews a district court's legal conclusions de novo and its factual findings for clear error. *Hill v. Hofbauer,* 337 F.3d 706, 710 (6th Cir. 2003).

## III. Analysis

### A. Trial Court's Failure to Appoint an Independent Psychologist

Durr contends in habeas claim forty-two that the trial court's failure to appoint an independent psychologist to assist trial counsel with preparation for the mitigation phase denied him a fundamentally fair trial. Initially we must determine whether the district court erred in ruling that habeas claim forty-two was procedurally defaulted. The district court reasoned that claim forty-two was procedurally defaulted because Durr knew the claim existed during direct appeal, but failed to raise it at that time.

This Court has held that Ohio's use of the doctrine of res judicata to preclude a merits determination of a claim raised in post-conviction proceedings that had been, or should have been, raised on direct appeal is an adequate and independent state ground barring federal habeas review. *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000) ("Ohio has a rule that claims must be raised on direct appeal if possible; otherwise, res judicata bars their litigation in subsequent state proceedings."). A claim is procedurally defaulted if there is a state procedural rule that the petitioner failed to follow, that the state courts actually enforced, and that constitutes an adequate and independent state ground to foreclose review of the federal constitutional claim. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). However, the petitioner may excuse the default if he can show cause for failure to follow the rule and prejudice resulting therefrom. *Id.*; *Poindexter v. Mitchell*, 454 F.3d 564, 583 (6th Cir. 2006).

As the Warden concedes, the district court incorrectly determined that habeas claim forty-two was procedurally defaulted, because the state courts adjudicated this claim on the merits on post-conviction review.[1] Although Durr could have presented the claim on direct appeal, because the state courts did not "actually enforce" the procedural rule requiring presentation of claims on direct appeal, the procedural default doctrine is not applicable. *See Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (stating that "[t]he mere existence of a basis for a state procedural bar does not deprive . . . [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case"); *Bowling v. Parker*, 344 F.3d 487, 499 (6th Cir. 2003) (stating that "there must be unambiguous state-court reliance on a procedural default for it to block" this Court's review). Therefore, we review the merits of habeas claim forty-two.

On Durr's motion for delayed reconsideration, the Ohio Court of Appeals held that no duty existed on the part of the trial court to unilaterally appoint an expert on behalf of a defendant who is charged with a capital offense. *Durr*, No. 57140, at *13. The district court also found no merit in this claim, explaining that because trial counsel did not request the appointment of a psychologist, "the trial court had no basis to determine whether such an expert was 'reasonably necessary.'"[2]

---

[1] In denying this claim on post-conviction, the Ohio Court of Common Pleas, County of Cuyahoga held that "[s]ince no expert psychologist was requested, the Court had no duty to appoint one and thereby interfere with defense trial strategy, and accordingly, this claim is denied." *State v. Durr*, No. CR-231670, at *10 (Ohio Ct. Com. Pl. July 6, 1993) (unpublished opinion).

[2] Durr was represented at his criminal trial by Jay Milano, Thomas M. Shaughnessy, and Michael Pincus. Future references to "trial counsel" will therefore reference these attorneys.

Durr is not entitled to relief on this claim. As Durr concedes, trial counsel did not request the appointment of a psychologist from the trial court. Trial counsel Jerry Milano said, "the most the Court would pay for any expert is $500.00, [so] we did not attempt to get any other experts, such as a pathologist, criminalist, psychologist, or mitigation specialist. In my experience, you cannot even get a qualified expert to talk to you for $500.00."

Durr nonetheless argues that the appointment of a psychologist would have provided the jury with mitigation evidence. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that an indigent defendant is entitled to expert assistance in two scenarios: (1) where the defendant's sanity at the time of the offense is likely to be a significant factor at trial; or (2) where the prosecution submits evidence of a capital defendant's future dangerousness through the state's own psychiatrists. *Ake,* 470 U.S. at 82-84 ("The risk of error from denial of [expert] assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question. . . . [This] discussion compels a similar conclusion in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness."); *see also Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000) (interpreting *Ake* to recognize that an indigent defendant is entitled to psychiatric assistance during sentencing if sanity was a significant issue at trial or state first presents evidence of future dangerousness).

Neither *Ake* scenario applies here. Durr did not allege that there was a significant issue as to his sanity at the time of trial nor did the prosecutor present evidence concerning his future dangerousness. In fact, during mitigation, when Durr's counsel referred to mental disease as a possible mitigation factor, he expressly stated that "there's been no evidence of that, so that doesn't apply." Similarly, at no point during the prosecution's arguments at mitigation was evidence presented establishing Durr's future dangerousness. For this reason, the cases Durr cites are inapposite. *Cf. Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (pre-AEDPA case vacating defendant's death sentence where the jury did not hear evidence during mitigation that the crime was the product of defendant's mental retardation or organic brain disease); *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003) (pre-AEDPA case holding that the defendant was entitled to an independent psychiatrist after presenting sufficient facts that his diminished mental capacity would be his main defense at trial).

Thus, the state courts' decision cannot be contrary to, or an unreasonable application of *Ake*. Furthermore, to extend *Ake* to the facts of this case would force every trial court to appoint experts for indigent defendants even if not requested, or risk a subsequent challenge to the fairness of the trial. Such a result is not only an unnecessary expansion of *Ake*, but actually undermines the Court's subsequent discussion of *Ake* in *Caldwell*, 472 U.S. at 323 n.1 ("Given that Petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision."); *see also Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006) (holding that to establish ineffective assistance of counsel at mitigation for failure to obtain a mental health expert, there must be some evidence that the petitioner's mental health was at issue), *cert. denied*, (Jan. 08, 2007) (2007 WL 36643) (No. 06-7399).

In short, the state court's decision was not contrary to nor an unreasonable application of clearly established federal law. The district court did not err in denying the merits of this claim.

### B. Ineffective Assistance of Trial Counsel at Mitigation Phase

In habeas claim fifty, Durr contends that trial counsel were constitutionally ineffective for failing to: (1) interview members of his family; (2) obtain experts for mitigation; (3) object to portions of the State's closing argument; and (4) object to allegedly improper jury instructions. The district court held that habeas claim fifty was procedurally defaulted because Durr could have raised, but failed to raise claim fifty on direct appeal.

There are two variants of res judicata under Ohio law for collateral attacks on convictions. *Lundgren v. Mitchell*, 440 F.3d 754, 765 n.2 (6th Cir. 2006). The first variant is when a petitioner could have, but failed, to bring a claim on direct review. *Id.* The second variant occurs in state court when a claim was *actually brought and litigated* on direct appeal. *Id.* This second variant of res judicata cannot form the basis of federal procedural default, however, because the petitioner did not *fail* to comply with a state procedural rule–namely that claims must be raised on direct appeal if possible. *See id.*

As the Warden again concedes, habeas claim fifty is not procedurally defaulted because the state courts either incorrectly ruled that certain claims were barred by res judicata, or did not correctly enforce the procedural bar. Claim fifty is comprised of fifteen sub-claims. Although sub-claims 1, 2, 3(d)-(h), and 4(a) were not raised until post-conviction and delayed reconsideration, and could have been presented on direct appeal, the Ohio post-conviction courts thought they had been raised and actually litigated on direct appeal and ruled that these eight sub-claims were barred by res judicata. This was incorrect because these sub-claims were being raised for the first time in post-conviction and delayed reconsideration, and had never been ruled on during direct appeal. The Ohio post-conviction courts' res judicata ruling was factually incorrect. Thus, it cannot be said that Durr failed to comply with a state procedural rule that was an "adequate and independent" state ground under *Maupin*. *See Maupin*, 785 F.2d at 138. We may therefore review these sub-claims on the merits. *See Caldwell*, 472 U.S. at 327; *Baze*, 371 F.3d at 320.

The Ohio state courts correctly held on collateral review that claims: 3(a)-(c), (i), and 4(b)-(d) were barred by res judicata because they were raised and decided on the merits on direct appeal. The error arose in the district court, which incorrectly held that these claims were procedurally defaulted because the Ohio state court held they were barred by res judicata. However, because the state court relied on the second type of res judicata, the district court erred because this type of res judicata is not available as a basis for procedural default in federal court. *See Lundgren*, 440 F.3d at 765 n.2. We also review these sub-claims on the merits.

To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel renders ineffective assistance when his performance "[falls] below an objective standard of reasonableness," but there is a "strong presumption" that counsel's performance was professionally reasonable. *Id.* at 688-89. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA. That is, a petitioner must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance. He must show that the state court of appeals applied *Strickland* to the facts of his case in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

### 1. Failure to Investigate Mitigation Evidence

Durr argues that trial counsel failed to interview certain family members prior to mitigation and neglected to obtain his social history. The district court found that Durr failed to show prejudice because "[s]imply listing the claimed omissions of trial counsel is not enough." The Ohio courts never addressed this portion of claim fifty on the merits, and never held it to be procedurally defaulted. Therefore, this Court applies the less deferential standard of review set forth in *Maples*. *Maples*, 340 F.3d at 436.

During mitigation, Durr's trial counsel presented two witnesses: Azriel Johnson, Durr's mother, and Janice Durr, Durr's common law wife. Azriel Johnson gave the jury a historical perspective of Durr's early childhood years, academics, work experience, relationships, and marital

history. Durr's mother testified about his seemingly normal childhood. She described his years at Catholic school, where he earned average grades and "got along very well," showing no behavior problems. She also described her relationship with Durr as "very good," noting that if Durr had a problem, he could always come and talk to her about it, no matter how late at night. Azriel further recounted Durr working two jobs, and how he always kept her grass cut and made sure to shovel the snow in her driveway. Azriel testified that although Durr never knew his real father, he maintained a "very good relationship" with his step-father during his early years. She concluded by stating she loved and believed in Darryl.

Janice Durr testified about her marriage with Durr, how she initiated the sexual part of their relationship, the various jobs that Durr maintained during the relationship, and described Durr as "really sweet" and a "real gentlem[a]n." She recounted the birth of their son, how Durr stayed with her and provided whatever she might need, and even recalled how Debbie Mullins became a part of the Durr family.

Durr alleges that his trial counsel were ineffective for failing to interview and present additional testimony from Tammy Jackson, Charles Johnson, Michael Durr, and Denise Durr. In her affidavit, Tammy Jackson, a former girlfriend, stated that she dated Durr for two years starting in 1979, and that he "was never disrespectful to [her] in any way." Charles Johnson, Durr's stepfather, described in his affidavit Durr's early childhood years, stating that Durr called him "Dad," followed him everywhere, and as he was growing up "always talked about becoming a manager." Like Azriel, Charles also stated that he trusted and believed in Durr, that Azriel made sure that Durr got good grades in school, and that Durr was a good kid who did things for everybody. The jury heard similar comments during his mother's testimony.

In his affidavit, Michael, Durr's older brother, discussed how all the Durr children adhered to strict rules about house chores, telephone use, and playing outside. Michael also recalled how Durr would run away from home as a child, but never for more than twelve hours. Denise, Durr's oldest sister, stated in her affidavit that her father, Willie Durr, used to beat Azriel prior to their separation, and that Azriel refused to let the children contact Willie or his family. Denise described that Durr never witnessed any abuse because Willie left the home before Durr's birth, but that Azriel became "bitter" for years afterwards. Denise also discussed Durr's early childhood years, providing a similar background as Michael's affidavit and Azriel's testimony about growing up in the Durr house. She also added that the family's needs were met by their mother's income and that their mother emphasized the importance of a good education.

The foregoing testimony is cumulative of that given by Durr's mother and his common law wife that Durr grew up in a relatively stable home where rules were enforced, and basic needs were met. This Court has held the failure to present additional mitigating evidence that is "merely cumulative" of that already presented does not establish prejudice. *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005); *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way–in strength and subject matter–from the evidence actually presented at sentencing."). *Cf. Carter*, 443 F.3d at 531 (holding that trial counsel was not ineffective where the additional testimony of the petitioner's family members was cumulative, and affidavits themselves described a relatively stable, although imperfect, family environment). The omitted testimony does not reflect an upbringing that would give rise to an ineffective assistance of counsel claim.

Moreover, had Tammy testified, the prosecution could have introduced rebuttal evidence concerning Durr's treatment of other women, including his rape convictions. *See State v. Raglin*, 699 N.E.2d 482, 490 (Ohio 1998) (holding that the appellant was not unfairly prejudiced by state's presentation of rebuttal witness, because the "prosecution was entitled to introduce relevant evidence rebutting the existence of any statutorily defined or other mitigating factor first asserted by the defense"). This included the fact that only a few weeks before the start of his capital trial, Durr pled

guilty to rape charges involving two separate incidents involving teenage girls. One of these rapes took place just one quarter of a mile from where the body of Angel Vincent was found.

Trial counsel conducted a reasonable investigation by interviewing and presenting the two people who appear to know more about Durr than anyone else: Azriel, his mother, and Janice, his ex-wife, and presenting Durr as basically a good person. Taken together, the additional affidavits present nothing new that "would have stood out to the jury in such a way as to change the calculation the jury previously made when weighing the aggravating and mitigating circumstances of the murder." *Hill*, 400 F.3d at 319. Durr fails to show error under either prong of *Strickland*. The district court correctly rejected this claim. This claim is denied.

### 2. Failure to Obtain Necessary Experts

Durr claims that trial counsel rendered ineffective assistance by failing to obtain all necessary competent experts; specifically a social worker, an independent psychologist, and an expert on cross-cultural issues. The district court rejected the merits of this claim, explaining that trial counsel knew enough about Durr's background to make a tactical decision that the risk of having the experts testify outweighed the potential benefit. This claim was never addressed by the Ohio courts on the merits, so we apply the less deferential standard of review set forth in *Maples*.

Durr contends that the failure to retain a social worker resulted in the absence of a comprehensive and thorough psychosocial history, making it impossible for counsel to understand, develop, and present evidence in mitigation to the jury, or to make reasonable and informed decisions about Durr. In support, Durr submitted the affidavit of Jane Core, the director of the mitigation section of the Ohio Public Defender Commission. Core's affidavit, however, contains no analysis of Durr and fails to mention any facts of his case. Rather, Core only describes the role of a mitigation specialist and how defense counsel use these experts in the typical death penalty case. The affidavit does not even discuss the potential effect such an expert would have had on the jury's decision to return a death sentence or not. Durr fails to show how the absence of this expert resulted in prejudice under *Strickland*.

Durr also submitted the affidavit of Dr. James Eisenberg, a psychologist. Dr. Eisenberg claimed that an independent psychologist's testimony during mitigation would have provided the jury with a mitigating factor under Ohio Rev. Code § 2929.04(B)(7)[3] due to "Durr's lack of appropriate role models, [the] absence of a biological father, [and having] an emotionally isolated family . . . ." Dr. Eisenberg claimed that Durr grew up in a home with inconsistent discipline and little supervision. He also claimed that the jury had no understanding of Durr's underlying psychological issues.

Dr. Eisenberg's conclusions are contradicted by the affidavits of Durr's family members. Contrary to Dr. Eisenberg's assertion that the Durr children received inadequate discipline, Denise Durr stated in her affidavit that "house rules were strictly enforced. Punishment was meted out by spanking, or pinching when [Azriel] was too pregnant to spank . . . . Overnight stays were prohibited, even with relatives." Further, although Dr. Eisenberg claimed that the Durr children had little supervision, Denise stated that Azriel "spent her days off taking us [children] to ice shows and the movies."

Michael's affidavit undermines Dr. Eisenberg's assertions that the Durr family was "emotionally isolated," stating that "[m]y mother worked a floating schedule, but always seemed to have time for her children." Also, Charles Johnson stated in his affidavit that Durr "followed me

---

[3]"Any other factors that are relevant to the issue of whether the offender should be sentenced to death." Ohio Rev. Code § 2929.04(B)(7).

everywhere" and "called me Dad," contrary to Dr. Eisenberg's conclusion that Durr lacked an appropriate father figure. Durr himself admitted to having a father figure, stating that "[t]he 'father figure' in my life was Mr. Paul," referring to the biological father of Durr's younger brother, Milton.

More importantly, Dr. Eisenberg did not find Durr to have any psychological problems. In fact, Dr. Eisenberg stated in his report that "[t]he clinical interview and the psychological testing do not indicate the presence of an underlying mental disorder." Counsel then cannot be faulted for failing to present evidence that apparently does not exist. *See Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002) (holding that counsel's failure to discover evidence of mental disease after pursuing false leads was not ineffective under *Strickland*). Thus, Durr cannot demonstrate that counsel was deficient for failing to present Dr. Eisenberg's testimony.

Finally, Durr argues that counsel should have retained an expert on cross-cultural issues, submitting the affidavit of Dr. Judith Skillings in support. Durr claims that Dr. Skillings would have given the jurors a better explanation into the cross-cultural issues Durr faced – such as explaining to the jury some of the reasons that Durr was drawn to white women. However, Dr. Skillings' affidavit merely speculates on the impact racism had on the jury:

> In my opinion, the jury should have received an explanation of who Darryl Durr was, and been forced to turn the color of the case around. If Darryl had been white, and Janice and Debby African-American, it is doubtful that Debby's uncorroborated accusations would have been given much weight.

Phrases such as "in my opinion" or "it is doubtful" do not establish prejudice under *Strickland*. *See Strickland,* 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Again, Durr fails to show prejudice.

In sum, we agree with the district court that the background information provided by the experts' affidavits would have "open[ed] an indeniable Pandora's box allowing the jury to hear about [Durr's] prior record and anything and everything about [his] life." Given the lack of mitigating evidence available in this case, and the likelihood that the testimony of Durr's experts would have done more harm than good, the decision not to retain experts was a sound one. Not only is there no prejudice, but trial counsels' decision appears to be very prudent given the circumstances. This claim is denied.

### 3. Failure to Object to Portions of the State's Closing Argument

Durr contends that trial counsel should have objected to the following instances of prosecutorial misconduct during the prosecutor's closing argument for the penalty phase: (a) listing of all statutory mitigating factors on a blackboard; (b) commenting about Durr's statement being unsworn; (c) discussing all of the potential mitigating factors; (d) comparing civil and criminal law; (e) referring to Durr's prior convictions; (f) stating that society demanded the death penalty for Durr; (g) asserting his personal knowledge and belief that Durr deserved the death penalty; (h) stating that there were younger people on death row; and (i) arguing non-statutory aggravating circumstances, including the facts of the crime, the lack of remorse, and the photographs admitted into evidence. The district court found no merit to this sub-claim. The Ohio courts addressed some, but not all, of these sub-claims on the merits. We address each sub-claim in turn, except for sub-claim (b), which we will address last.

The relevant question in analyzing a claim for prosecutorial misconduct on habeas review is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). To satisfy this standard, the conduct must be both improper and flagrant. *Broom v. Mitchell,* 441 F.3d 392, 412 (6th Cir. 2006) (citing *Bates v. Bell,* 402 F.3d 635, 641 (6th

Cir.), *cert. denied,* 126 S.Ct. 163 (2005)), *cert. denied*, 127 S. Ct. 1376 (2007). Conduct is improper if made "to incite the passions and prejudices of the jurors . . . ." *United States v. Solivan,* 937 F.2d 1146, 1151 (6th Cir. 1991). If conduct is found to be improper, four factors are then considered to determine flagrancy: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates*, 402 F.3d. at 641.

In a trial of any size, numerous potentially objectionable events occur. "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Lundgren*, 440 F.3d at 774 (quoting *Engle v. Isaac*, 456 U.S. 107, 134 (1982)).

> [A]ny single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice. *See Hodge v. Hurley,* 426 F.3d 368, 376 (6th Cir. 2005) ("[C]ounsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside [professional norms].").

*Id*. at 774-75. With these standards in mind, we now turn to the individual claims.

As an initial matter, we note that an examination of the trial court transcript shows that Durr's counsel successfully objected to sub-claims (b), (e), (g), and (h). Thus, Durr cannot show deficient performance on trial counsels' part. However, even if counsel had not objected, Durr has not shown how this failure denied him due process.

Taking sub-claims (a) and (c) together, Durr charges that trial counsel should have objected to the prosecution's argument discussing all statutory mitigating factors. In ruling on these sub-claims, the Ohio Supreme Court held that Durr was not prejudiced by prosecutorial misconduct. *Durr*, 568 N.E.2d at 684. The district court also found no merit in this claim. Because these claims were addressed on the merits by the Ohio courts, we review them under the AEDPA standard.

The prosecutor's discussion of all statutory mitigating factors was improper. *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir. 2004). Nevertheless, Durr is not entitled to relief because "the prosecution simply laid out all the mitigating factors and argued why they did not apply. " *Hicks*, 384 F.3d at 224 (quoting *Turner v. Calderon*, 281 F.3d 851, 870 (9th Cir. 2002)). "The prosecution did not 'mischaracterize[] a potentially mitigating factor as an aggravating factor . . . .'" *Id.* (quoting *Turner*, 281 F.3d at 870). The prosecution in Durr's case made a similar argument. Durr does not allege that the State mischaracterized a potentially mitigating factor as an aggravating factor. As in *Hicks*, we do not find the decision of the Ohio Supreme Court to be an unreasonable application of *Strickland*. Finding no merit, claims (a) and (c) are denied.

Durr's sub-claim (d) alleges that trial counsel should have objected to what he characterizes as "the prosecution's allegedly improper comparison between civil and criminal law." The Ohio state courts did not decide this sub-claim on the merits. Therefore, we review this claim under the *Maples* standard.

In closing, the prosecutor stated: "[n]ow, the first matter you can consider, whether the victim, whether the victim infused or facilitated the offense. That may be like a bar room brawl or fight where the victim may have picked a fight with the defendant, the defendant gains the upper hand and slays her." In the first place, it is far from clear how this testimony can be characterized as a comparison of civil with criminal law, and no other comments by the prosecutor fit that

description either. In any event, when read in context, it is clear that the prosecutor was simply attempting to explain one of the statutory mitigating factors; the remark was isolated and was not likely to confuse the jury or create prejudice for Durr. In other words, the prosecutor's statement did not so infect the trial with unfairness so as to deny Durr due process. *See Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. at 637; *Bowling*, 344 F.3d at 512-13. Again, Durr fails to show resulting prejudice for counsel's failure to object. Considering the abundance of evidence against Durr, this remark did not affect the outcome of the proceedings. The district court found this claim meritless. We agree. Sub-claim (d) fails.

Sub-claim (e) alleges that Durr's trial counsel were ineffective for failing to object to the State's improper reference to Durr's prior convictions. The trial record shows that Durr's counsel did in fact object to this statement. Therefore, this sub-claim is denied.

In sub-claim (f) Durr asserts that trial counsel should have objected to the prosecutor's statement that society demanded the death penalty in this case. The prosecutor rhetorically inquired as to how the jury should determine the existence of mitigating factors: "What tells you as a human being, then a juror? Who speaks on behalf of society? Who will tell society what society's additude [sic] is toward this crime? You decide what mitigating factors have been shown you by defense counsel in this case." The prosecutor later added: "We are down to something more than just the law right now. We are down to what society views as an appropriate punishment for this type of conduct and this type of act. It's a heavy issue."

On direct appeal, the Ohio Supreme Court held that the prosecutor did not improperly argue that the jury was socially obligated to sentence Durr to death. In rejecting this claim, the court stated that: "[e]ven if we were to interpret the prosecutor's remarks as [Durr] argues, we 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" *Durr*, 568 N.E.2d at 684 (quoting *Donnelly*, 416 U.S. at 647). Because the state court reviewed this claim on the merits, we review this claim under the AEDPA standard.

This Court has held that "'unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible.'" *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000) (holding on habeas review that prosecutor's argument to jurors that they should impose the death sentence to fulfill their societal duty was not clearly improper, and did not result in a fundamentally unfair trial) (quoting *Solivan*, 937 F.2d at 1151). *Cf. Solivan*, 937 F.2d at 1148 (holding that egregious prosecutorial misconduct constituted error when in closing the prosecutor asked the jury to "tell [defendant] and all of the other drug dealers like her . . . that we don't want that stuff in Northern Kentucky . . . .").

The prosecutor in Durr's case urged the jury to weigh all the aggravating circumstances against the mitigating factors in making its sentencing determination. Like in *Byrd*, it is not clear that the comment in Durr's case was even improper "and it certainly does not render Petitioner's entire trial fundamentally unfair" for purposes of the "more stringent standards applicable on habeas review . . . ." *Byrd*, 209 F.3d at 539. The Ohio court's decision was not an unreasonable application of federal law. We agree with the district court's determination that this claim is meritless. Sub-claim (f) is denied.

In sub-claim (g), Durr alleges that trial counsel failed to object to the prosecutor's allegedly improper statement about his personal knowledge and belief that Durr deserved the death penalty. The prosecutor stated:

> I have tried cases for about 17 years. I have also felt that the most important phase of any trial is the guilt or innocence phase and that's why I and the people in my division argue in favor of conviction when we are certain of it.

That's why I argue to you so strongly because I believe in the facts and I believe that
you would see them. This stage is considerably different though. You will, when
I explain it to you, readily recognize that the words of counsel are spoken from a
standpoint of irresponsibility.

Durr's trial counsel objected, but was overruled by the court. On direct appeal, the Ohio Supreme
Court held that no error occurred because "[i]n this case, the prosecutor stated his opinion after
summarizing the evidence that described the circumstances surrounding Angel Vincent's death.
Viewed in the proper perspective, the prosecutor's comments do not constitute error." *Durr*, 568
N.E.2d at 684. The district court found no merit in this claim. Because the state courts ruled on this
claim on the merits, we review sub-claim (g) under the AEDPA standard.

In *Bates v. Bell*, 402 F.3d 635, 644 (6th Cir. 2005), this Court recognized that "prosecutors
are prohibited from expressing their personal opinion as to the existence of aggravating or mitigating
circumstances and the appropriateness of the death penalty." In *Bates*, the prosecutors repeatedly
expressed their personal opinion as to both the "credibility of the witnesses and the ultimate issue
in the hearing." *Bates*, 402 F.3d at 644. Again and again, the prosecutors denigrated the mitigating
evidence presented by Bates's two witnesses. *Id*. at 646. "The prosecutors repeatedly referred to
the near-certain murders that would occur if Bates were permitted to live," "suggest[ed] that the jury
would be an accomplice to future murders if they failed to sentence Bates to death," and "compared
him to a rabid dog." *Id*. at 643. This Court held that "[t]he prosecutor's unnecessary and
intolerable conduct injected such vitriol into the proceedings, as to question the fairness of the entire
sentencing hearing." *Id*. at 649. This Court went on to say that "if a habeas court is in "grave
doubt" as to the harmlessness of an error, the habeas petitioner must prevail." *Id*. at 649.

While the prosecutor's comments in Durr's case were improper, they were not so flagrant
as those in *Bates*. And the prosecutor later offered words tending to offset his comments concerning
his personal beliefs about the case, when he stated: "You should make your decision uninfluenced
by any attorney who has talked to you . . . I feel society's interest is best served if you look at a case
objectively and reach a decision without somebody telling you what you have to do, urge you to do
. . . ." The prosecutor's subsequent statement was consistent with state law and therefore did not
prejudice Durr. In any event, Durr's counsel did object, and the trial court instructed the jury that
closing arguments by counsel were not evidence. Additionally, while the prosecutor's statement
appears deliberate, it was isolated. Thus, on balance, the prosecutor's comments do not give this
Court the same "grave doubt" about their harmlessness as we felt in *Bates*. The Ohio Supreme
Court's decision was not an unreasonable application of federal law, and the district court did not
err in denying habeas relief as to this claim.

In sub-claim (h) Durr alleges that trial counsel were ineffective for failing to object to the
prosecution's statement that there were younger people on death row. The trial record shows that
Durr's counsel did object to this statement. Therefore, sub-claim (h) is denied.

Sub-claim (i) alleges that trial counsel were ineffective for failing to object to the State's
argument concerning non-statutory aggravating circumstances. The Ohio Supreme Court denied
sub-claim (i) on direct appeal, holding that the remarks were too insignificant to rise to the level of
plain error, and that Durr did not suffer prejudice because of it. *Durr*, 568 N.E.2d at 684. The
district court also found no merit in this claim. Because the state court ruled on sub-claim (i) on the
merits, we review this claim under the AEDPA standard.

This Court has previously held that the "consideration of a non-statutory aggravating
circumstance, even if contrary to state law, does not violate the Constitution." *Smith v. Mitchell*, 348
F.3d 177, 210 (6th Cir. 2003) (citing *Barclay v. Florida*, 463 U.S. 939 (1983)). The decision of the
Ohio Supreme Court was not an unreasonable application of federal law. We find no prejudice from
trial counsels' failure to object to the prosecution's statements concerning non-statutory aggravating

circumstances. We agree with the merits determination of the district court. Therefore, sub-claim (i) is denied.

The most meritorious of Durr's claims, and the most troublesome allegations of prosecutorial misconduct, are raised in sub-claim (b). Durr claims that trial counsel were ineffective for failing to object to the prosecution's repeated references at mitigation to Durr's decision not to testify under oath. Durr points to three occasions when the prosecutor made such statements. The first example occurred during mitigation when the prosecutor said:

> This man has taken the stand and talked to you in an unsworn statement, never den[y]ing that he killed that girl, never apologizing that he killed that girl, never explaining to you why he did these things. This is his time. He could have said anything from that witness stand and a man, I think with a little more courage than an aunt(sic), would have done more than send women to the stand on his behalf and then take the stand and try to create a reasonable doubt in your mind to intimidate you.

The second objectionable statement occurred when discussing the application of the mitigating factor concerning duress, coercion, or strong provocation, the prosecutor said:

> You saw him on the stand, calm and cool in his statements, prepared to face you. Of course he doesn't want to face cross-examination.

A third time, when addressing the mitigating factor concerning whether Durr had prior convictions, the prosecutor said:

> The defendant's lack of prior criminal convictions. Will he take the stand with a [s]worn statement? Unfortunately, I don't know how that applies to this case.

Durr's counsel objected to this third statement, which the trial court sustained. Defense counsel then asked the court to instruct the jury to disregard that line, which the court then did.

On direct appeal in the context of a prosecutorial misconduct claim, the Ohio Supreme Court determined that the prosecutor's first statement was "adequately tailored to inform the jury that the appellant's statements were made absent oath or affirmation." *Durr*, 568 N.E.2d at 683. As for the prosecutor's third statement, the state court held that it violated *State v. DePew*, 528 N.E.2d 542 (Ohio 1988) (syllabus), but found no denial of a fair trial as the trial court admonished the jury to disregard the remark. *Id*. at 684. The district court found no merit in this claim on habeas review when it was raised as an ineffective assistance of trial counsel claim. Because the Ohio Supreme Court denied this claim on the merits, we review under the AEDPA standard.

As a general proposition, a prosecutor's comment regarding a defendant's failure to testify violates the Fifth Amendment. *DePew v. Anderson*, 311 F.3d 742, 750 (6th Cir. 2002) (citing *Griffin v. California*, 380 U.S. 609 (1965)). In Ohio, a defendant may present an unsworn statement during the mitigation phase without being subjected to cross-examination. Ohio Rev. Code § 2929.03(D)(1). Accordingly, "the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *DePew*, 311 F.3d 742, 745 (6th Cir. 2002) (quoting *DePew*, 528 N.E.2d 542, 553-54 (Ohio 1998)).

*DePew* involved several inflammatory statements made by the prosecutor during the penalty phase, each designed to completely undercut the defendant's sole mitigation theory that he was basically a law-abiding and peaceful person. *DePew*, 311 F.3d 748-49. The prosecutor made

several inflammatory statements. First, the prosecutor commented on the defendant's failure to testify in the following manner:

> [T]he gentleman for the defendant, he told you five different times about the oath you took, and about the oath we all take, and the oath I take, and the oath you take – everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath. Everybody in this case took the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew.

*DePew*, 528 N.E.2d at 554.

The prosecution then made several more improper statements regarding the defendant's past. The prosecutor asked a defense witness on cross-examination whether he was aware of the defendant's involvement in a knife fight at a convenience store. *DePew*, 528 N.E.2d at 553. This question "was particularly inflammatory because it involved the same violent act of which the defendant had been convicted . . . ." *DePew*, 311 F.3d at 749. Next, the prosecutor presented without authentication or foundation, an irrelevant photograph of the defendant standing next to a marijuana plant. *DePew*, 528 N.E.2d at 555. "The admission of this photograph raised unsubstantiated questions about the defendant's criminal history, threatening his assertions of having a law-abiding past." *DePew*, 311 F.3d at 749. "Finally, the prosecutor stated in his closing argument that the defendant failed to take the stand in order to prevent the prosecutor from asking him whether he had a subsequent conviction." *Id.* "This improper statement also undermined defendant's theory that he was a law-abiding citizen, implying that the defendant was instead a recidivist continually engaged in criminal conduct." *Id.*

The Ohio Supreme Court affirmed DePew's convictions and sentence, finding the remarks "harmless error in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation . . . ." *DePew*, 528 N.E.2d at 554. On habeas review, however, this Court reversed, holding that the improper statements, particularly when taken together:

> [W]ere designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant. While improper comments of a prosecutor do not generally warrant automatic reversal, the statements in [DePew] require it because they go to the heart of the defendant's sole mitigating theory . . . [a]llowing the prosecutor to make inadmissible, inflammatory – and in the words of the Ohio Supreme Court, 'misleading' – statements . . . undermines the defendant's right under the Eighth Amendment to receive the 'constitutionally indispensable' consideration of his proffered mitigating evidence.

*DePew*, 311 F.3d at 749.

We also held that the prosecutor's statement concerning the defendant's refusal to testify at sentencing violated the defendant's Fifth Amendment rights as set forth in *Griffin*. *DePew*, 311 F.3d at 750 (citing *Griffin*, 380 U.S. 609).

We concluded that the state courts improperly applied the harmless error standard. *DePew*, 311 F.3d at 751. The Ohio Supreme Court had found the error harmless on the grounds that "the crime was 'brutal' and that reversal of the death penalty on these grounds violated the 'interest of the public, which has every right to expect its criminal justice system to work effectively.'" *Id.* (quoting *DePew*, 528 N.E.2d at 557). This Court held that this was not the proper constitutional definition of harmless error, and that "[t]he public's, or the voter's feelings in favor of capital punishment for brutal crimes are a well-known part of our political tradition, but these feelings

cannot rise above or displace constitutional provisions ensuring a fair trial." *DePew*, 311 F.3d at 751. Thus, cumulatively, it was clear that the errors were not harmless, because "we [had] 'grave doubt' that the statements by the prosecutor did not have an effect on the sentencing of the defendant." *DePew*, 311 F.3d at 749.

Although close, we find that *DePew* is distinguishable. In *DePew*, defense counsel did not object to the prosecutor's comment on defendant's unsworn statement, and did not request, nor did the trial court give, any curative instruction. *See Joseph v. Coyle*, 469 F.3d 441, 473-74 (6th Cir. 2006) (holding it was not contrary to nor an unreasonable application of federal law to deny claim of prosecutorial misconduct in spite of prosecutor's comment pointing out defendant's failure to take the stand, when the comment was not flagrant and the court instructed the jury about defendant's right not to testify), *cert. denied*, 127 S. Ct. 1827 (2007). In Durr's case, defense counsel *did* object to the prosecutor's third reference to Durr's failure to testify under oath. Durr's counsel also requested, and received, an instruction to the jury to disregard the statement. The prosecutor made no subsequent references to Durr's failure to testify under oath after the objection was granted and the curative jury instruction was given. At the close of mitigation, defense counsel went so far as to move for a mistrial based on the objections to the prosecution's statements during final argument.

Furthermore, unlike *DePew*, the prosecutor in Durr's case did not question any of Durr's witnesses in an attempt to bring up Durr's inflammatory criminal past: his two previous rape convictions. Also, the prosecutor in this case did not introduce any irrelevant prejudicial evidence that tended to "raise unsubstantiated questions about [Durr's] criminal history, threatening his assertions of having a law-abiding past." *DePew*, 311 F.3d at 749. Also, here, the prosecutor made no impermissible statements in his closing argument. Durr's claim is also distinguishable because *DePew* was a pre-AEDPA case subject to de novo review. *DePew*, 311 F.3d at 748.

Clearly, the prosecution's statements regarding Durr's failure to testify under oath were improper, and utterly gratuitous given the strength of the evidence against Durr. The rule in *Griffin* is simple, and there is no reason why any prosecutor should flirt with violating it. However, we are not on direct appeal here, but applying the deferential standard of the AEDPA. *Cf. DePew*, 311 F.3d at 748 (applying pre-AEDPA standard by reviewing the district court's grant of habeas corpus de novo). And the prosecutor's behavior in this case was much more limited than that in *DePew*, and attempts were made to correct it. On balance, then, we are not convinced that the prosecutor's conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. 643). Nonetheless, we would like to remind prosecutors to avoid such dramatic, needless errors. Nevertheless, for the reasons just discussed, this case is distinguishable from *DePew*, and therefore, is neither contrary to nor an unreasonable application of clearly established federal law.[4]

### 4. Failure to Object to Jury Instructions

Durr claims that trial counsel rendered ineffective assistance by failing to object to the following jury instructions upon completion of the mitigation phase: (a) informing the jury that it could consider additional evidence and argument on the aggravating circumstances as submitted during the mitigation phase; (b) instructing the jury on all statutory mitigating factors, including those not raised by the defense; (c) instructing the jury that it was making a recommendation only; and, (d) instructing the jury that it was not permitted to consider sympathy or mercy.

---

[4] Durr raises a fifth issue in his brief before this Court. Even though not granted in the COA, Durr contends that the district court erred in denying him an evidentiary hearing under 28 U.S.C. §2254(e)(2). Even if properly brought before this Court, this claim would fail because Durr's "bald assertions and conclusory allegations do not provide sufficient ground to warrant . . . an evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

"'On habeas review, errors on instructions are not reviewable unless they deprive a defendant of constitutional due process.'" *Mason v. Mitchell*, 320 F.3d 604, 638 (6th Cir. 2003) (quoting *Gall v. Parker,* 231 F.3d 265, 321 (6th Cir. 2000)). This Court must determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process.'" *Byrd*, 209 F.3d at 527 (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

In sub-claim (a), Durr argues that trial counsel should have objected to the trial court's instruction that the jury could consider additional evidence and argument on the aggravating circumstances presented during the mitigation phase of his trial. The district court found this claim without merit. The Ohio Courts never ruled on the merits of this claim, so we review under the *Maples* standard.

During mitigation, the State did not cross-examine any witness for the defense and offered no additional evidence. The State chose instead to rely upon the jury's verdicts of guilty for kidnaping, robbery, and rape to support the death sentence for the aggravated murder conviction. Durr does not explain how this instruction resulted in prejudice, and we can find none.

In sub-claim (b), Durr argues that trial counsel were ineffective at mitigation for failing to object to the trial court's instructions to the jury on all statutory mitigating factors, including those not raised by the defense. On direct appeal, the Ohio Supreme Court denied this claim, finding that Durr was afforded a fair trial in which counsel protected all of his constitutional rights. *Durr*, 568 N.E.2d at 685. The district court found no merit in this claim. Because it was ruled on the merits in state court, we review sub-claim (b) under the AEDPA standard.

This Court has recently held that, "[t]he right to have certain statutory mitigating factors considered (or aggravating ones ignored) is a creature of state statute, not the federal Constitution." *Hill*, 400 F.3d at 333 (citing *Zant v. Stephens,* 462 U.S. 862, 878-79 (1983)). The fact that an "'instruction was allegedly incorrect under state law is not a basis for habeas relief' by itself." *Hill*, 400 F.3d at 333 (quoting *Estelle*, 502 U.S. at 71-72). "It is only when the error of state law "'so infected the entire trial that the resulting conviction violates due process.'" *Id*. Durr does not show how the allegedly incorrect instruction "so infected the entire trial" that his conviction violated due process. The district court correctly determined that this instruction did not violate Durr's federal rights. The Ohio Supreme Court's decision was not contrary to or an unreasonable application of federal law. The district court did not err in denying this claim.

Next, Durr argues that trial counsel were ineffective for failing to object to the trial court's use of the term "recommendation" to describe the jury's sentencing role at mitigation. On direct appeal, the Supreme Court of Ohio denied this claim under *Strickland*, holding that based upon the facts in the case, the use of the term "recommendation" was not error, and remained within the constitutional boundaries set by *Caldwell*, so counsel's performance could not have been deficient. *Durr*, 568 N.E.2d at 683, 85. The district court also found no merit in this claim. Because the state courts ruled on sub-claim (c) on the merits, we review this claim under the AEDPA standard.

This Court has denied habeas relief arising from jury instructions that inform the jury that it is making a sentencing recommendation when such an instruction is an accurate recitation of state law. *See Buell v. Mitchell*, 274 F.3d 337, 352-53 (6th Cir. 2001) (citing Ohio Rev. Code § 2929.03(D)(2)). In *Mapes v. Coyle,* 171 F.3d 408, 415 (6th Cir. 1999), the Court held that, "while it is somewhat inaccurate to state that a sentencing jury 'recommends' a life sentence when such a recommendation would be binding . . . even if the trial judge's instruction was erroneous it could not have diminished the jury's sense of responsibility in *Caldwell* terms . . . this is an accurate statement of Ohio Law. . . [t]here [is] no constitutional error." Durr does not show resulting prejudice from this instruction. It follows that the Ohio Supreme Court's decision was not contrary to or an unreasonable application of federal law. We agree with the district court's determination that this instruction did not violate Durr's constitutional rights. Sub-claim (c) is denied.

Finally, Durr argues in sub-claim (d) that his constitutional rights were violated by the trial court's instructing the jury at mitigation that they were not permitted to consider sympathy or mercy. On direct appeal, the Supreme Court of Ohio denied this claim on the merits. *Durr*, 568 N.E.2d at 685. The district court found no merit in this claim, explaining that nothing in the instruction violated Durr's federal rights. Because the state court ruled on this claim on the merits, we review sub-claim (d) under the AEDPA standard.

This Court held in *Mapes* that "an instruction that the jury should not be swayed by 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' was not only unobjectionable . . . it 'served the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on [irrelevant,] extraneous emotional factors.'" *Mapes*, 171 F.3d at 416 (quoting *California v. Brown*, 479 U.S. 538, 542-43 (1987)). Based on this Court's previous holdings, the instructions given at Durr's trial were not improper. Thus, Durr cannot show any resulting prejudice from trial counsel's failure to object. The Ohio Supreme Court's decision was not contrary to or an unreasonable application of federal law, as the district court found. Sub-claim (d) is denied.

## C. Insufficiency of Evidence for Rape Conviction

Finally, Durr argues that the prosecution presented insufficient evidence to support his rape conviction. Specifically, Durr claims that the state failed to present proof beyond a reasonable doubt that Durr at any time raped Angel Vincent. He argues that there was no medical or eyewitness testimony to establish a rape occurred, and that circumstantial evidence of Angel's partially naked body is insufficient to sustain the charge of rape and the capital specification that the offense occurred in the commission of rape. Durr initially raised this claim on direct appeal. Because the state court reviewed this claim on the merits, we review this claim under the stricter AEDPA standard.

Ohio's statute concerning rape at the time of Durr's trial stated that no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. Ohio Rev. Code § 2907.02 (A)(2) (repealed 1995). Sexual conduct was defined as "vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." Ohio Rev. Code § 2907.01(A) (repealed 1995). Sexual contact was defined at the time of Durr's trial as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is female, a breast for the purpose of sexually arousing or gratifying either person." Ohio Rev. Code 2907.01 (repealed 1995).

Acknowledging that Vincent's "body was so severely infested with bacteria, testing for the presence of acid phosphates and spermatozoa was inconclusive," *Durr*, 568 N.E.2d at 677, the Ohio Supreme Court nevertheless rejected the claim, stating:

> In this case, the prosecution presented highly probative circumstantial evidence. Except for a pair of tennis shoes, the victim's body was found nude from the waist down. In addition, Deborah Mullins testified that when she saw Angel tied up in the back of [Durr's] car, [Durr] informed Deborah that he was going to kill Angel because she would tell. Based on these facts, we believe that there was sufficient probative evidence from which a rational trier of fact could have found [Durr] guilty of rape beyond a reasonable doubt.

*Durr*, 568 N.E.2d at 682.

Two state supreme court justices disagreed with the majority's determination that there was sufficient evidence to support a conviction of rape. *Id.* at 686. (Moyer, C.J. and Brown, J., concurring). The district court held that "the evidence cited by . . . the Supreme Court of Ohio support[s] a finding that sufficient evidence existed for *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." We review this claim under the AEDPA standard.

This issue presents a very close question, since there is absolutely no physical evidence of any penetration to affirmatively establish sexual conduct under Ohio Rev. Code § 2907.01(A) (repealed 1995), rather then a less severe charge of sexual contact under Ohio Rev. Code § 2907.01(B) (repealed 1995). Were this case before us on de novo review, we might be hard-pressed to conclude "after reviewing the evidence in the light most favorable to the prosecution, [that] *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). However, our review on habeas is very deferential to the state courts, and we simply cannot say that the insufficiency of evidence claim resulted in a decision that was contrary to, or involved an unreasonable application of *Jackson*.

As the Ohio Supreme Court held, although circumstantial, the evidence in this case was "highly probative." Deborah Mullins testified that she saw the victim tied up in Durr's car, and that Durr told her that he was going to "waste" Angel because "she would tell." The body was nude from the waste down, except for tennis shoes. Medical evidence was inconclusive because the amount of bacteria in the body. Based on this evidence, a jury could have reasonably inferred that Angel had been raped. As circumstantial evidence is entitled to equal weight as direct evidence, *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993), we cannot conclude on habeas review that the Ohio Supreme Court erred. As the state of Ohio has considerable expertise in matters of Ohio state criminal law, it is appropriate for this Court to exercise substantial deference to the Ohio Supreme Court in this area. *See Medina v. California*, 505 U.S. 437, 445-46 (1992) (stating that Court "should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States."). Therefore, claim thirty-six is denied.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's denial of Durr's petition for a writ of habeas corpus.

---

**CONCURRENCE**

---

R. GUY COLE, JR., Circuit Judge, concurring.  I concur in the majority's opinion, but I write separately to address two concerns.

First, with regard to the rape conviction, I disagree with the Ohio Supreme Court's view that the circumstantial evidence in this case was "highly probative" of rape. (Maj. Op. 19.)  The court relied on (1) Durr's unexplained statement that he was going to "waste" Angel because "she would tell," and (2) that her body was nude from the waist down when discovered.  This strikes me as *somewhat* probative; I have doubts whether any juror could properly infer from this evidence, beyond a reasonable doubt, that rape occurred.  Nonetheless, AEPDA constrains our review, and I cannot say that the Ohio Supreme Court—even if incorrect—was *objectively unreasonable* when holding that a juror could reach that conclusion.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003) ("In order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.").

Second, with regard to the relevance of expert testimony to ineffective-assistance claims, the majority's broad statement that "[p]hrases such as 'in my opinion' or 'it is doubtful' do not establish prejudice under *Strickland*,"(Maj. Op. 10), must be clarified.  If this statement is read to mean that opinion testimony cannot establish prejudice, it is simply wrong.  Opinions are at the heart of expert testimony. *See* Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto *in the form of an opinion* or otherwise . . . .") (emphasis added).  And expert testimony is often crucial, and necessary, to show what mitigating evidence could have been presented at the penalty phase.  In short, there is nothing suspect about testimony involving phrases such as "in my opinion" or "it is doubtful," and *Strickland* does not say otherwise.  *See, e.g., Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005) (holding that petitioner satisfied *Strickland*'s prejudice prong based on forensic psychiatrist's "opinion" that petitioner did not have specific intent to kill); *Riley v. Cockrell*, 215 F. Supp. 2d 765, 777 (D. Tex. 2002) (noting that to establish prejudice, petitioner "would have to establish that had his counsel requested Dr. Lawrence to *opine* whether [petitioner] would commit crimes of violence [that] would constitute a continuing danger to people outside of the prison environment, Dr. Lawrence would have in fact given that *opinion*, and had Dr. Lawrence so testified, there is a reasonable probability that the result in his punishment hearing would have been different" (emphasis added)).

In this case, it was Dr. Skillings's opinion that explaining cross-cultural issues to the jury would have impacted the jurors' views of Durr.  That opinion fails to establish prejudice, not because it is an opinion, but because there is not a reasonable probability that the jury would have reached a different outcome even if it had heard this particular evidence.