File Name: 07a0594n.06
Filed: August 20, 2007

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 05-2498**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| James Traylor, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Janette Price, | ) | **O P I N I O N** |
| | ) | |
| Respondent-Appellee. | ) | |

**BEFORE:** **KENNEDY, GIBBONS, and McKEAGUE, Circuit Judges.**

**McKeague, Circuit Judge.** A jury convicted Petitioner James Traylor of second-degree murder, and he was sentenced to twenty-five to fifty years in prison. After exhausting state court remedies, he filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Michigan. That court adopted the report and recommendation of the magistrate judge to whom the case was referred, thereby denying Petitioner's objections to the magistrate judge's report and recommendation and dismissing the habeas petition. On appeal, Petitioner argues that the district court erred in denying him habeas relief. Specifically, he argues that the prosecutor committed misconduct at trial by commenting on the absence of Petitioner's alibi witness. For the reasons stated below, we AFFIRM the decision of the district court.

## I. BACKGROUND

On July 30, 1999, a Michigan state court sentenced Petitioner to twenty-five to fifty years in prison following his conviction of second-degree murder in connection with the death of Stacey Hill. Hill was murdered on June 3, 1998, in River Rouge, Michigan, which is near Detroit. According to the pathologist who conducted the autopsy, Hill was struck in the forehead with a "linear or straight, hard object" that broke her skull, and her injuries were consistent with blows from a 2"x4". J.A. at 479, 486. The jury convicted Petitioner following a four-day trial. At the trial, the prosecution's theory of the case was that Petitioner bludgeoned Hill with a 2"x4", while the defense's theory was that Rico Eady, Hill's boyfriend and the brother of Petitioner's girlfriend, had committed the murder.

Petitioner admitted at trial that he walked to Hill's house at around 7:00 a.m. on June 3, 1998. He stated that Hill then drove him to the Michigan Family Independence Agency so he could obtain food stamps, with which the two of them purchased cognac and beer. They then returned to Hill's house, at which time he began drinking and she began using cocaine. Later that morning, James Lonberger, Hill's step-father, came by Hill's house. Petitioner stated that Lonberger did not enter the house but rather stayed on the porch where he and Petitioner talked.

Later that afternoon, according to Petitioner, Hill wanted to purchase more drugs. She therefore drove the two of them to a point on Visger Road where she made the purchase, and following that, she drove Petitioner to a location near his friend Darren Ewing's house. At that time, which Petitioner estimated to be between 4:00 p.m. and 5:00 p.m., Petitioner and Hill parted ways. Petitioner stated that he remained at Ewing's house until around 8:30 p.m., at which time he

proceeded to a store to redeem more food stamps. Following that, he went to Terry Harrison's house, where he stayed overnight. Petitioner claimed that he did not return to Hill's house during the evening hours of June 3 and that the last time he saw Hill was when she dropped him off near Ewing's house. When Petitioner was asked what he was wearing that day, he testified that he "own[s] a black baseball cap" and that he "could have had on a like red or orange" jacket. J.A. at 574. He also testified that he is about six feet, one inch tall.

Rosa Daniels, who lived across the street from Hill's house, testified that on June 3, 1998 she first saw Hill at around 10:00 a.m. or 11:00 a.m. At that time, Hill was with a man wearing a baseball cap. Daniels had never before seen the man. Daniels testified that she later saw that man sitting on Hill's porch with Lonberger. Later still, Daniels saw the man–the same man who earlier that day had been with Hill and had been talking with Lonberger–in Hill's car. Because Daniels heard a car alarm sounding, she went outside and told the man in the car that he had to turn off the alarm in order to start the car. The man asked Daniels if she knew how to do so, and she replied that she did not. The man then stepped out of the car and ran toward a nearby alley. Daniels called the police, and she saw a piece of 2"x4" laying inside the car. Although Daniels could not positively identify Petitioner as the man she saw, she stated that the man wore the same baseball cap each time she saw him that day.

Cheryl Toliver, who lived directly across the street from Hill, testified that on June 3, 1998, she saw a man sitting on Hill's front porch talking with Lonberger. She stated that the man wore a baseball cap, a red and black jacket, and jeans. The man was black and about six feet in height. Toliver testified that the next time she saw either Hill or the man was in the afternoon or early

evening of June 3 (and she later stated that it was around 8:30 p.m. or 9:00 p.m.) when she saw the man leaving Hill's house with something in his hand, which she originally thought was an umbrella but later learned was a 2"x4". Toliver saw the man enter Hill's car, try to start the car, and fail to do so because the car's alarm sounded. Toliver testified that Daniels told the man to turn the alarm off because otherwise the car would not start, at which time, according to Toliver, the man exited the car, walked down the sidewalk, and ran through the alley. Toliver stated that the man she saw with Lonberger was the same man who exited Hill's house with what she thought was an umbrella and that the man was not Hill's boyfriend Rico Eady, whom Toliver knew and had not seen on June 3, 1998. Although Toliver did not see the man "face-to-face," she testified that the man had the same build as Petitioner. J.A. at 384-85.

Anthony Givens, who lived across the street at an angle from Hill, testified that at around 8:45 a.m. on June 3, 1998, he saw Hill and Petitioner exiting a vehicle and approaching Hill's porch. Givens stated that he had seen Petitioner around a week earlier on Hill's porch and that he therefore recognized Petitioner when he saw Petitioner again on June 3. Givens saw Petitioner and Hill at Hill's house again later that morning. According to Givens, he again saw Petitioner sitting on Hill's porch with Lonberger at around 3:35 or 4:00 p.m. that day. Givens testified that later still he saw Petitioner leaving Hill's house with "a stick in his hand, maybe a 2x4" and that Petitioner tried to start Hill's vehicle but failed as "it had something like the alarm stuck on it or something." J.A. 398-99. Petitioner then exited the vehicle and walked quickly in the direction of a nearby alley. According to Givens, Petitioner wore the same clothing when he exited the car–a black hat with a bill on it and an orange, red, and black jacket–that he wore every other time Givens saw him that day.

Givens testified that he was positive that Petitioner was the person he saw leaving Hill's house with the 2"x4" on June 3, 1998, and he selected Petitioner's picture from a photographic lineup the day following the murder.

Noel Malone, who lived directly across the street from Hill, testified that on June 3, 1998, he saw a man leave Hill's house with a 2"x4" in his hand and try to start Hill's car. Malone stated that the car would not start because its alarm had sounded. The man therefore exited the car "and took off up the alley." J.A. at 349. According to Malone, the man was black, was around five feet eleven inches tall or taller, and had a medium build and dark brown skin. Malone stated that the man wore a black cap and a jacket. Although Malone was unable to identify Petitioner as the man he saw that night, he did testify that the man was not Rico Eady.

Corey Brown testified that on June 3, 1998, he saw a man leave Hill's house with a 2"x4" in his hand. The man ran to Hill's car and "tried to take the car," but could not because the car's alarm was activated. J.A. at 458. According to Brown, the man then exited the car, walked to the alley, and ran down the alley. The man was black, about the same build as Brown himself (five feet, eleven inches tall, 155 pounds), and in his early thirties; the man wore a red, white, and black jacket along with a black baseball cap.

The jury found Petitioner guilty of second-degree murder at the conclusion of the trial. Petitioner then appealed to the Michigan Court of Appeals, claiming that (1) the prosecutor made misleading and excessive comments at trial with respect to the absence of his alibi witness, which constituted prosecutorial misconduct and violated his right to due process and to cross-examine

witnesses against him and (2) the trial court erred in refusing to grant his request for a lesser included offense instruction.

Petitioner's first claim arose out of comments made by the prosecutor during her questioning of Petitioner and during her closing statement. As stated above, Petitioner testified that he had been at Ewing's house during the evening of June 3, 1998, and that he then proceeded to Harrison's house, where he stayed overnight. On cross-examination, the prosecutor asked Petitioner, "Do we have Darren Ewing here?" J.A. at 580. Petitioner responded, "No, he's not." J.A. at 580. The trial court sustained Petitioner's counsel's objection to the form of that question. Yet the prosecutor soon after again asked Petitioner whether Ewing was there on the day of the trial, at which time the defense again objected. The trial court called a recess, and Petitioner's counsel moved for a mistrial based on the prosecution's questions regarding Ewing's absence.[1] The prosecutor was aware that prior to

---

[1] The precise exchange during cross-examination of Petitioner is as follows:

A [Petitioner]: I weigh about what I weigh now.
Q [Ms. Kowal, the prosecutor]: We don't have any way to verify that? Do we have Darren Ewing here?
A: No, he's not.
Mr. Cripps [on behalf of Petitioner]: Objection as to the form of that question.
The Court: Sustained.
. . .
Q [Ms. Kowal]: You talked about – you named two people here, someone who you were with between 3:30 and 8:30, right?
A: Yes.
Q: And is he here?
Mr. Cripps: Your honor, I object to the form of the question.
The Court: We are going to ask [] you please to take a recess at this time . . . .

J.A. at 580-81.

trial Ewing gave a tape-recorded statement that was favorable to Petitioner and that Ewing had failed to appear to testify even though he was served with a subpoena. The trial court therefore sustained the defense's objection to the form of the prosecution's question, but it denied the motion for a mistrial because it reasoned that the prosecutor was permitted to argue or comment on Petitioner's failure to call corroborating witnesses.

During her closing, the prosecutor stated, "Ladies and gentlemen, when [Petitioner], again, chooses to produce a defense and fails to call corroborating witnesses or witnesses in support, you may take that as a lie. You may take that as consciousness of guilt. No Darren Ewing. No Mr. Harrison." J.A. at 638. Petitioner's counsel renewed his motion for a mistrial following closing arguments on the ground that the prosecutor improperly commented that Petitioner's failure to produce Ewing as a witness shows consciousness of guilt. The trial court denied the motion for a mistrial but concluded that the issue warranted the following curative instruction:

> The defendant's failure to call witnesses to support his defense does not cast the burden upon the defendant to prove his innocence, since the defendant cannot be convicted upon the basis that he failed to affirmatively prove his defense.
> The circumstantial evidence resulting from [the] defendant's failure to offer evidence and witnesses to support a proffered defense is no substitute for the prosecutor's burden to prove the defendant guilty beyond a reasonable doubt.
> In spite of this failure, the defendant cannot be convicted unless the prosecution has carried it's [sic] burden of proof on every element of the crime charged.

J.A. at 681-82.

On October 12, 2001, the Michigan Court of Appeals affirmed Petitioner's conviction and sentence. *People v. Traylor*, No. 222169, 2001 WL 1219403, at *2 (Mich. Ct. App. Oct. 12, 2001) (per curiam). It held,

> Defendant first argues that he was denied a fair and impartial trial because the prosecutor's comments on the absence of his corroborating alibi witnesses tended to shift the burden of proof from the prosecution to him. We disagree. Allegations of prosecutorial misconduct are reviewed case by case. We examine the pertinent portions of the record and view the alleged misconduct in light of the defendant's arguments and the evidence admitted at trial.
>
> Prosecutorial comments that infringe on a defendant's right not to testify may constitute error; however, where a defendant testifies at trial and advances an alternative theory of the case that would exonerate him from the crime, prosecutorial comments on the validity of the theory do not shift the burden of proof to the defendant. Once a defendant makes an issue legally relevant by advancing a theory, the prosecutor is permitted to comment on the improbability of the defendant's theory. Arguing that a witness or evidence does not exist attacks [a] defendant's credibility and questions the reliability of a defendant's theory. Further, a prosecutor is permitted to comment on a defendant's failure to produce corroborating witnesses whenever the defendant takes the stand and testifies on his own behalf. Here, the prosecutor's remarks during cross-examination and closing argument were proper responses to [the] defendant's assertion that the police had the wrong man and that he had an alibi.

*Traylor*, 2001 WL 1219403 at *1 (citations omitted). Petitioner filed an application for leave to appeal to the Michigan Supreme Court, and on April 29, 2002, that court denied his application because it was not persuaded that the questions presented should be reviewed. *People v. Traylor*, 643 N.W.2d 577 (Mich. 2002) (table decision).

Petitioner then sought habeas relief in the United States District Court for the Western District of Michigan, raising the same two issues that he raised in the Michigan Court of Appeals. The magistrate judge recommended that Petitioner's habeas petition be denied. With respect to the prosecutorial misconduct claim–the claim relevant to the instant appeal–the magistrate judge characterized the prosecutor's comments as improper. The magistrate judge nevertheless concluded that Petitioner was not deprived of a fair trial as a result of the prosecutor's comments and thus that

Petitioner was not entitled to habeas relief on the ground of prosecutorial misconduct, because there was strong evidence of Petitioner's guilt and the trial court gave a curative instruction.

The district court denied Petitioner's objections to the magistrate's recommendation and dismissed Petitioner's habeas petition with prejudice. The court concluded that "the prosecution's repeated statements about the non-available and possibly favorable alibi witnesses may only be described as misconduct." J.A. at 192. However, it noted that "there was extremely strong evidence against the accused," particularly Givens' positive identification of Petitioner as well as the "consistent and highly credible" testimony of four other witnesses that a man matching Petitioner's general description was seen leaving Hill's house the night of the murder with a board in his hand. J.A. at 193. The district court thus concluded that the trial was not fundamentally unfair and the evidence of guilt was sufficiently overwhelming to sustain the jury's verdict.

Petitioner timely appealed. Before this Court, he raises only the prosecutorial misconduct claim.

## II. ANALYSIS

### A. Standard of Review

We apply a de novo standard of review to the district court's conclusions of law and a clearly erroneous standard of review to the district court's findings of fact. *Brown v. Palmer*, 441 F.3d 347, 350 (6th Cir. 2006) (citation omitted). AEDPA dictates the standard of review for state court determinations in habeas petitions. *Id.* The Supreme Court has held that:

> [u]nder § 2254(d)(1), the writ may issue only if one of the following two conditions
> is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary
> to . . . clearly established Federal law, as determined by the Supreme Court of the

> United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The Supreme Court has further noted that "contrary to" should be construed to mean "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" and that the proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 409-11. Finally, state court findings of fact are presumed correct, and the habeas applicant has the burden of rebutting that presumption by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1)).

**B. Prosecutorial Misconduct**

Claims of prosecutorial misconduct are reviewed deferentially in habeas cases. *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "The relevant question is whether the prosecutor[']s comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). It is not enough that the remarks of the prosecutor "were undesirable or even universally condemned." *Darden*, 477 U.S. at 181.

We have held, in accordance with the *Darden* standard, that the prosecutor's conduct must be both improper and flagrant. *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007) (citations omitted). The inquiry is sequential: if the remarks are found to be improper, then the court will proceed to determine whether they are flagrant. *Spisak v. Mitchell*, 465 F.3d 684, 713 (6th Cir. 2006). This two-step approach "merely reiterates factors set forth in Supreme Court decisions evaluating prosecutorial misconduct"; as such, we have "consistently utilized the two-step inquiry for reviewing claims of prosecutorial misconduct" in its post-AEDPA cases. *Smith v. Yukins*, 129 F. App'x 251, 253 (6th Cir. 2005).

We have also held that conduct is improper "if made to incite the passions and prejudices of the jurors." *Durr*, 487 F.3d at 439 (citation and quotation marks omitted). In determining whether comments are flagrant, four factors are considered: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* (quoting *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005)).

## 1. Whether the Comments Were Improper

The Michigan Court of Appeals determined that the prosecutor's comments were not improper. Accordingly, for Petitioner's habeas claim to proceed to the flagrancy inquiry, that determination must be contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. *Williams*, 529 U.S. at 411-12. We conclude that it is.

The Supreme Court's decision in *Berger v. United States*, 295 U.S. 78 (1935), *overruled on other grounds*, *Stirone v. United States*, 361 U.S. 212, 215 (1960), demonstrates the Michigan Court of Appeals' error. In *Berger*, the Supreme Court concluded that the prosecutor "overstepped the bounds of [] propriety and fairness" by, inter alia, misstating the facts in cross-examining witnesses. 295 U.S. at 84. According to the Court, the prosecutor's argument to the jury "contain[ed] improper insinuations and assertions calculated to mislead the jury." *Id.* at 85. The prosecutor in the instant case insinuated that Petitioner's alibi's testimony would have been adverse and that Petitioner wilfully failed to produce the alibi for that reason, even though she was aware that Ewing gave a tape-recorded statement on July 10, 1999, that was favorable to Petitioner and that Ewing had failed to appear to testify even after being served with a subpoena. Furthermore, the comments were made notwithstanding the trial court's condemnation of them through the sustaining of several defense objections. Consequently, although the Michigan Court of Appeals is correct that the prosecutor is permitted to comment on the improbability of the defendant's theory once a defendant makes an issue legally relevant by advancing that theory, the impropriety of the prosecutor's comments in the instant case arises from the misleading nature and improper insinuations present in her comments.

## 2. Whether the Comments Were Flagrant

Having determined that the comments were improper, we turn our attention to whether they were flagrant. As stated above, we examine "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength

of the evidence against the defendant." *Durr*, 487 F.3d at 439. An examination of these factors reveals that the prosecutor's comments were not flagrant.

The first factor weighs in favor of the government. Although the prosecutor's comments were misleading, we have held that courts should not ordinarily overturn a criminal conviction on the basis of a prosecutor's comments, particularly in the case in which the trial court gives a curative instruction. *United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001); *see also United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) ("Furthermore, the prejudicial effect of improper comments may be negated by curative instructions to the jury."). Consequently, because the trial court provided the curative instruction set out above, this factor weighs in favor of the government.

The second factor also weighs in the government's favor. The prosecutor twice questioned Petitioner regarding Ewing's whereabouts and also made an argument with respect to Ewing's absence during her closing statement. Yet this Court has stated that "to constitute the denial of a fair trial, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). The prosecutor's comments were not extensive in the context of the full trial.

The third factor weighs in favor of Petitioner. As stated above, the prosecutor was aware that Ewing gave a favorable tape-recorded statement on July 10, 1999, and that Ewing had failed to appear to testify even though he was served with a subpoena, yet the prosecutor twice asked Petitioner if Ewing was present to corroborate Petitioner's alibi defense and again referred to Ewing's absence during her closing statement. These facts, especially because some of the

prosecutor's comments were made following the trial court's sustaining the defense's objection to them, demonstrate that the comments were deliberately made.

The final factor strongly weighs in favor of the government. As detailed above, the evidence against Petitioner was overwhelming. Givens testified that he was positive that Petitioner was the person he saw leaving Hill's house with "a stick in his hand, maybe a 2x4," trying to start Hill's vehicle, failing as the car's alarm was apparently stuck, and then exiting the vehicle and walking quickly in the direction of a nearby alley. J.A. at 398-99. Givens also testified that he selected Petitioner's picture from a photographic lineup the day following the murder. Moreover, Givens stated that on June 3, 1998, the man leaving the house with the 2"x4" wore an orange, red, and black jacket and a black hat, articles of clothing consistent with Petitioner's testimony regarding the clothing he wore on the day of the murder.

While other witnesses did not specifically identify Petitioner, their testimony paralleled that of Givens. Specifically, Daniels and Toliver testified that the man they saw earlier on the day of June 3, 1998, talking with Lonberger on Hill's front porch was the same man they saw exit Hill's house that night with an object in his hand. This was the same man who tried to start Hill's car, and when he was unsuccessful, proceeded in the direction of a nearby alley. This testimony is detrimental to Petitioner because even he admits that he talked with Lonberger on Hill's porch on the day in question.

Finally, Malone and Brown also testified that they saw a man leave Hill's house with a 2"x4" in his hand, try to start Hill's car, and proceed in the direction of the alley when he was unsuccessful. Malone and Brown stated that the man wore clothing consistent with the clothing Petitioner admitted

to wearing that night. Malone also testified that the man was not Rico Eady, the person to whom Petitioner pointed as the murderer.

The Supreme Court has emphasized that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). While some of the prosecutor's comments in the instant case may have been improper, "that is not enough," *Darden*, 477 U.S. at 181, and the above analysis–particularly the overwhelming evidence of Petitioner's guilt–demonstrates that the comments were not flagrant and the fairness of the trial was not compromised.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.