RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SHANNON LADEL KEYS,

        *Petitioner-Appellant,*

    *v.*

RAYMOND BOOKER,

        *Respondent-Appellee.*

No. 14-1274

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:11-cv-11117—Thomas L. Ludington, District Judge.

Argued: June 10, 2015

Decided and Filed: August 19, 2015

Before: COLE, Chief Judge; GILMAN and KETHLEDGE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** F. Martin Tieber, TIEBER LAW OFFICE, Lansing, Michigan, for Appellant. Bruce H. Edwards, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** F. Martin Tieber, TIEBER LAW OFFICE, Lansing, Michigan, for Appellant. John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

     GILMAN, J., delivered the opinion of the court in which COLE, C.J. and KETHLEDGE, J., joined. KETHLEDGE, J. (pp. 17–18), delivered a separate concurring opinion.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Shannon Ladel Keys was convicted in 2005 by a Michigan jury of second-degree murder, conspiracy to commit unarmed robbery, and assault with the intent to rob while armed. Due in part to his "habitual offender" status, the Mecosta County Circuit Court subsequently sentenced Keys to life in prison for the murder and conspiracy charges and to 12 to 25 years of imprisonment for the assault charge (to be served concurrently). Following the exhaustion of his state-court remedies, Keys filed a petition for habeas corpus in the United States District Court for the Eastern District of Michigan in 2011.

Keys makes three arguments in his petition: (1) the prosecution failed to present evidence sufficient to support his convictions for second-degree murder and assault with the intent to rob while armed, (2) his due process rights were violated when the jury panel viewed him in shackles during voir dire, and (3) his counsel on direct appeal was constitutionally ineffective for failing to fully investigate and raise the shackling claim. The district court denied the petition. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

The opinion rendered by the Michigan Court of Appeals provides the following relevant facts:

> Defendant's convictions arise from the death of Jeremiah "Jake" Monroe, who was shot and killed during a failed robbery attempt. De Lauren Gordon allegedly committed the shooting, and was aided by Marvin Redmond and defendant, who allegedly planned the robbery and drove Gordon to Monroe's residence.
>
> . . .
>
> . . . Redmond testified that Gordon was in defendant's presence and eyesight when he placed a gun in the console of defendant's vehicle on the way to Monroe's house the night before Monroe's murder. Unable to find Monroe, the group abandoned their plans to rob Monroe that night, deciding to try again the

next night. The jurors could infer from this testimony that defendant knew that Gordon had a gun and would again bring it on the subsequent attempt. Defendant maintains that the evidence shows that he did not plan or intend to assist an armed robbery, and that he actually tried to discourage and prevent Gordon from bringing a gun to the robbery. Defendant emphasizes that Redmond testified that he and defendant advised Gordon "a thousand times" that it was not necessary to use a gun because Monroe would be unlikely to resist the robbery. However, the jurors could infer from this testimony that defendant must have known about Gordon's gun, otherwise he would not have thought it necessary to tell him repeatedly not to use it during the robbery attempt. Furthermore, defendant's belief that Monroe would feel too intimidated and overpowered to resist the robbery attempt was based on defendant's original plan in which four robbers would confront Monroe. In the final plan, only one robber–Gordon–was to confront Monroe, thus raising the possibility that Monroe might attempt to resist and that Gordon would resort to using a weapon to commit the robbery. Additionally, defendant and Redmond did not previously know Gordon, which increased the risk that Gordon would not follow defendant's and Redmond's repeated instructions to not involve a weapon in the robbery attempt.

*People v. Keys*, No. 264387, 2007 WL 395104, at *1–2 (Mich. Ct. App. Feb. 6, 2007) (unpublished).

The district court ably summarized the following additional facts in this case:

Previous to the murder, Keys "shot dice" with Monroe and, at times, the games involved thousands of dollars. In late February or early March 2003, Keys and Redmond discussed the possibility of robbing one of Monroe's games. Originally Keys's idea, Redmond indicated he might be interested. Later, the two discussed the idea again, deciding that neither could participate directly because Monroe knew them. However, because the plan was to take drug and dice money—along with cocaine—neither man was concerned that Monroe would report the robbery to the police. So Redmond decided to convince his brother Eli Evans (who lived in Lansing, Michigan and did not know Monroe) to get involved. Evans was "big and intimidating," and Redmond trusted him.

Keys and Redmond traveled from Big Rapids, Michigan to Lansing, and Redmond invited Evans into Keys's vehicle to discuss the plan. Keys explained that the robbery—or "lick"—would be "simple" because it involved a "young white boy." Keys also indicated that the take would be at least a couple of "stacks" (one thousand dollars). Finally, Keys explained that it was necessary to carry out the robbery as soon as possible because Monroe's friend "Cartwright" was out of town. At that point, Gordon came to Keys's vehicle as well. Evans then introduced Gordon to Keys and Redmond. Keys then explained to Gordon that it would be an easy robbery.

Keys did warn that Monroe's roommate, Stewart, might be present in the residence, and that there would be a dog. He also warned that there might be a .12-gauge shotgun in the house, but Evans liked the odds: "[f]our of us against one little, young white boy."

Redmond testified that during the trip back to Big Rapids, Gordon placed a semi-automatic weapon on the console of Keys's vehicle, and that Keys observed the weapon. Evans testified that he didn't see the gun, but admitted that he had previously seen Gordon with the semi-automatic pistol. Redmond also testified that Keys repeatedly said: "[Y]ou ain't going to need to use a gun for this . . . ." Likewise, Keys and Redmond repeated that no one needed to get hurt.

On the first attempt to rob Monroe, Keys and Redmond reiterated that "[s]houldn't nobody get hurt." While Evans was big and intimidating, he was also stable enough not to hurt or kill anyone. Redmond knew nothing about Gordon or his background, but he trusted his brother. Keys also said that they did not need a gun because it would be an easy robbery. Despite similar comments by Redmond, Gordon insisted on taking his weapon.

After the men were unable to locate Monroe on the first night, Redmond, Evans, and Gordon returned to Lansing. Once there, Redmond asked Evans if he was going to follow through with the robbery, but Evans declined. Evans did not like the fact that the plan involved only two of them going inside Monroe's house rather than all four. Indeed, Evans indicated that the plan "was stupid." Keys called Evans and asked if they were still coming down. Evans told Keys that he was not coming. So Keys told Redmond to bring Gordon, and that he would contact a friend in Grand Rapids to replace Evans. However, the arrangement fell through, and only Redmond and Gordon returned to participate in the robbery.

The night of the second attempt, Keys and Monroe went to a casino. Keys told Redmond and Gordon that he had dropped off Monroe. Keys also reported that he and Monroe had talked about what they would do if someone tried to rob them. Keys claimed that Monroe said he would not resist a robbery attempt. Keys then emphasized: "You don't really need to use no gun."

After hearing from Keys, Redmond drove Gordon to Monroe's house. Gordon was wearing a dark jacket, dark pants, dark boots, a hunter's mask, and gloves, and he had duct tape, a muzzle and raw hide bone for the dog, and his gun. According to Redmond, he again told Gordon no one needed to get hurt. Indeed, Redmond claimed he and Keys told Gordon "at least a thousand times" that no one was to be hurt and, that if Monroe "rebelled in any way, just run, just leave the house."

Keys and Redmond instructed Gordon to go into Monroe's house alone. Once inside, the robbery attempt failed and Gordon shot and killed Monroe. Keys spotted Gordon as he ran from Monroe's house, and directed Redmond to pick him up. Gordon told Redmond: "Just get me on the freeway, get me back to Lansing now."

*Keys v. Booker*, No. 11-11117, 2014 WL 462353, at *2-3 (E.D. Mich. Feb. 5, 2014) (alterations in original) (citations omitted).

**B.      Procedural background**

During a brief break in the voir dire proceedings to select a jury for Keys's trial, his attorney moved for a mistrial based on the fact that Keys had been brought into court while visibly shackled with hand restraints attached to a belly restraint.  Keys sat in court for nearly 90 minutes while restrained in this way.  Defense counsel claimed that the entire jury panel had seen Keys in restraints, but the prosecutor argued that there was "no way to know how many jurors saw or observed anything."   The trial judge had no doubt that the jurors had seen Keys's restraints, but denied the motion based on the following rationale:

> Let me state for the record that this certainly wasn't intentional that he come in here this way.  Defense counsel, attorney general, I; we had attempted to make this not happen.  It was—and based on some oversight here and there—and, by the way, I'm not going to start—I don't know who was at fault.  It did happen. I'm not—I'm really not concerned about, at this time, who was at fault. Just the thing happened.  We have to correct it accordingly.

> And I do feel that [defense counsel] certainly is correct in raising this. I do feel that it is an important issue.  I don't feel that it raises to the level, though, of declaring a mistrial or excusing this jury at this point in time. I feel that a curative instruction is appropriate.  He's dressed rather well—very well.  And there's no question in my mind, though, that most of the jury panel did see the restraints. But a curative instruction, plus the fact that there's going to be some testimony in this trial—I won't go into that issue.

> So I'm going to have to deny the motion to dismiss at this point in time or to declare that we have to start a new trial, and we're going to proceed accordingly.

There is no indication in the record that Keys ever again appeared before the jury in restraints.  On the other hand, the jury never received a curative instruction specifically related to shackling.   But the trial court did issue the following instruction to the jurors regarding the presumption of innocence:

> A person accused of a crime is presumed to be innocent.  This means that you must start with the presumption that the defendant is innocent.  This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

The jury ultimately convicted Keys of second-degree murder, conspiracy to commit unarmed robbery, and assault with the intent to rob while armed.

The Michigan Court of Appeals affirmed Keys's convictions and sentence. *Keys*, 2007 WL 395104, at *6. Keys then filed a motion for relief from judgment with the trial court. That motion was denied, his subsequent appeal to the Michigan Court of Appeals was unsuccessful, and his motion for leave to appeal to the Michigan Supreme Court was turned down, *People v. Keys*, 794 N.W.2d 584 (Mich. 2011). Keys then filed his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in March 2011. The district court denied the petition and refused to grant a Certificate of Appealability (COA). A panel of this court later granted Keys a COA on the issues of insufficient evidence and the shackling. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

This court reviews de novo a district court's decision to grant or deny a petition for habeas corpus. *Pinchon v. Myers*, 615 F.3d 631, 638 (6th Cir. 2010). We are bound in that review, however, by the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *Id.* AEDPA limits this court's ability to grant state prisoners relief to those circumstances where the state court's decision was either (1) "contrary to" or "an unreasonable application of" clearly established federal law as declared by the Supreme Court, or (2) "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). A state-court decision may be "contrary to" clearly established federal law in one of two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An "unreasonable application" of clearly established federal law occurs when "a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case." *Id.* at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly." *Id.* at 411. Instead, this court may issue a writ of habeas corpus only in instances where all fairminded jurists would agree that the state court's decision conflicts with Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Keys raises three separate claims in his petition: (1) the jury was presented with insufficient evidence to support his convictions for second-degree murder and assault with intent to commit armed robbery, (2) he was denied his right to an impartial jury when he was exposed in shackles to the jury panel, and (3) his counsel on direct appeal was ineffective for failing to properly investigate and raise the shackling issue. Because the latter two claims are related, we will address them together.

**B.      The Michigan Court of Appeals did not unreasonably adjudicate Keys's sufficiency-of-the-evidence claim**

Keys's first claim is that the prosecution failed to present legally sufficient evidence to support his convictions for second-degree murder and assault with intent to commit armed robbery. (He does not contest his conviction for conspiracy to commit unarmed robbery.) Such a claim faces a daunting, doubly deferential standard of review. In addition to the so-called "AEDPA deference" discussed above, the case of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), limits a habeas court's review of a sufficiency-of-the-evidence claim to the question of "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)

Taken in tandem, AEDPA and *Jackson* allow us to grant relief only if the Michigan court's decision was an unreasonable application of *Jackson. See Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007) (affirming the denial of habeas relief despite the fact that, "on de novo review, [the court] might be hard-pressed to conclude . . . [that] *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (citing *Jackson*, 443 U.S. at 319). This standard erects "a nearly insurmountable hurdle" for petitioners who, like Keys, seek habeas relief on sufficiency-of-the-evidence grounds. *See Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

### 1. *Elements of the crimes for which Keys was convicted*

The prosecution must, of course, prove each element of the crimes for which Keys was convicted beyond a reasonable doubt. *See Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993). Our insufficient-evidence analysis will therefore start with the elements of the crimes in question.

Under Michigan law, "[t]he elements of assault with intent to rob while armed are: (1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being armed." *People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991). Michigan law defines second-degree murder, in turn, as (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Smith*, 731 N.W.2d 411, 414-15 (Mich. 2007). "The 'malice' required to prove murder requires either: (1) an intent to kill, (2) an intent to cause great bodily harm, or (3) wanton and wilful disregard that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *People v. Nowack*, 614 N.W.2d 78, 85 (Mich. 2000) (emphasis omitted).

As made clear in *Nowack*, "[t]he offense of second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences." *People v. Aldrich*, 631 N.W.2d 67, 80 (Mich. Ct. App. 2001) (internal quotation marks omitted). Under Michigan law, jurors "can properly infer malice from evidence that a defendant set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980); *see also People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999) ("Malice may also be inferred from the use of a deadly weapon.").

Keys was convicted on both the murder and the assault charges under an aider-and-abettor theory of liability. *See People v. Keys*, No. 264387, 2007 WL 395104, at *2 (Mich. Ct. App. Feb. 6, 2007). In order to convict Keys under this theory, the prosecution was required to prove that

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.

*People v. Moore*, 679 N.W.2d 41, 49 (Mich. 2004) (alteration in original) (quoting *Carines*, 597 N.W.2d at 135).

Michigan also subscribes to the common-law theory that Keys may be held criminally liable as an aider or abettor if "(1) the defendant intends or is aware that the principal is going to commit a specific criminal act; or (2) the criminal act committed by the principal is an incidental consequence[] which might reasonably be expected to result from the intended wrong." *People v. Robinson*, 715 N.W.2d 44, 49 (Mich. 2006) (alteration in original) (footnote omitted) (internal quotation marks omitted). Under any of these theories, however, Keys is guilty only if he consciously acted in a manner designed to assist in the success of the criminal venture. *See People v . Cooper*, 40 N.W.2d 708, 711 (Mich. 1950) ("In order to aid and abet another to commit a crime[,] it is necessary that defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed." (internal quotation marks omitted)).

### 2. *The Michigan Court of Appeals's ruling was not an unreasonable application of* Jackson v. Virginia

Keys argues that, because there was no direct testimony that he knew Gordon would use a gun to commit the robbery, the evidence at trial was insufficient to establish that he possessed the requisite intent for second-degree murder or to establish an assault with intent to rob while armed. To the contrary, he claims that "the prosecution's evidence clearly showed that Keys was not aware that Gordon was armed on March 12, that he did not intend that any armed robbery occur, and, most importantly, that he repeatedly expressed his intent that **no** physical assault or harm come to Monroe." Keys argues that the Michigan Court of Appeals's opinion relied on allegedly crucial errors made in reviewing the record. For instance, he takes issue with the court's finding that Redmond

> testified that Gordon was in defendant's presence and eyesight when he placed a gun in the console of defendant's vehicle on the way to Monroe's house the night before Monroe's murder. Unable to find Monroe, the group abandoned their plans to rob Monroe that night, deciding to try again the next night. The jurors could infer from this testimony that defendant knew that Gordon had a gun and would again bring it on the subsequent attempt.

*People v. Keys*, No. 264387, 2007 WL 395104, at \*2-3 (Mich. Ct. App. Feb. 6, 2007) (unpublished).

"In fact," Keys argues, "a thorough review of the record reflects that Redmond had stated he did not know whether Petitioner Keys saw the gun [on March 10] . . . [And] Gordon and Keys were never together in the same vehicle on the date of the actual robbery [March 12]." He also points out that

> [n]o other witness testified that Keys had any knowledge that Gordon had a weapon. Redmond's trial testimony concerning Keys's knowledge of any weapon was extremely limited, and premised on conjecture at best. At no point did he assert that he had direct knowledge that Keys was aware of the presence of a weapon, particularly on March 12, the date of the homicide.

But Keys's objection—which might have made for a compelling closing argument at trial—is out of place in this context. In reviewing an insufficient-evidence challenge on habeas review, we are singularly focused on one question: did the Michigan Court of Appeals unreasonably apply the *Jackson* standard to the facts of Keys's case? The lack of any witness with "direct knowledge" that Keys was aware of Gordon's weapon has little bearing on this analysis. *See People v. Wilson*, 493 N.W.2d 471, 476 (Mich. Ct. App. 1992) ("[I]ntent may be inferred from circumstantial evidence.").

Viewing the evidence in the light most favorable to the prosecution, as we must do under *Jackson*, 443 U.S. at 319, a reasonable trier of fact could readily infer that (1) Keys was aware that, despite repeated admonishments to the contrary, Gordon brought a gun along for the planned robbery on March 10, (2) Keys therefore had reason to believe that Gordon would again bring his gun along for the planned robbery on March 12, and (3) based on these circumstances, Monroe's murder was an incidental consequence that might reasonably be expected to result from the planned robbery. The jury was thus presented with ample evidence to sustain both Keys's conviction for assault with intent to rob while armed, *see People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991) (identifying the elements of assault with intent to rob while armed), and his conviction for second-degree murder, *see People v. Robinson*, 715 N.W.2d 44, 49 (Mich. 2006) (clarifying that one may be criminally liable under an aider-and-abettor theory when "the criminal act committed by the principal is an incidental consequence which might

reasonably be expected to result from the intended wrong"); *see also People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999) ("A jury may infer [the] malice [necessary for felony murder or second-degree murder] from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. Malice may also be inferred from the use of a deadly weapon." (citation omitted)).

These conclusions are especially reasonable in light of the change in plans between the first and second attempts to rob Monroe. The initial plot, which the group attempted to carry out on March 10, involved four men entering Monroe's residence (later reduced to two), a "real easy" job that, presumably due to the robbers' strength in numbers, would not require firearms or force. But when the robbery was actually perpetrated two days later, Gordon entered Monroe's residence alone, losing the advantage of outnumbering the intended victim. If Gordon brought a gun along for the attempted robbery on March 10, the jury could quite reasonably conclude that Keys had every reason to believe that Gordon would also bring one along on March 12. Keys's first claim, therefore, does not warrant habeas relief.

**C.    The Michigan Court of Appeals did not unreasonably adjudicate Keys's due process claim based on his shackling during voir dire or his related ineffective-assistance claim**

*1.    Impact of shackling on Keys's right to a fair trial and an impartial jury*

Keys also claims that he is entitled to habeas relief because he was denied his due process right to a fair trial when the jury panel saw him in shackles during voir dire. This claim was rejected on direct appeal. Keys raised it again as part of his motion for relief from judgment, this time armed with three affidavits: two from members of the jury and another from a private investigator who spoke with three additional jurors, all of whom said that they had viewed Keys in shackles during voir dire. (The only evidence of these affidavits in the record is the references made to them by the state post-conviction trial court.)

One of the affiants expressed the opinion that his fellow jury members were more likely to believe in Keys's guilt for having seen Keys shackled. That juror did not, however, explain the basis for his belief. And no juror indicated that seeing Keys in shackles influenced his or her own determination of Keys's guilt. The post-conviction trial court was not impressed by the

import of the affidavits, particularly in light of what that court deemed "overwhelming evidence of [Keys's] guilt." Nothing in the affidavits, according to the trial court, supported the notion that Keys's shackling prejudiced his defense.

### a.      Deck v. Missouri *generally prohibits shackling of a defendant during either the guilt or penalty phases of a criminal trial*

Keys now argues that the Michigan Court of Appeals's decision was contrary to or an unreasonable application of clearly established federal law, particularly as expressed in *Deck v. Missouri*, 544 U.S. 622 (2005). The petitioner in *Deck* was tried and convicted for the robbery and murder of an elderly couple. *Id.* at 624. The Missouri Supreme Court set aside Deck's initial death sentence and, during voir dire on resentencing, he was, without need, shackled in front of the jury panel. *Id.* at 625. Deck's attorney objected to the practice before, during, and after voir dire, but each objection was overruled. *Id.* Deck remained shackled throughout the resentencing proceeding, and the jury again sentenced him to death. *Id.*

On direct appeal, the Missouri Supreme Court rejected Deck's argument that his shackling violated his constitutional rights, concluding that there was "no record of the extent of the jury's awareness of the restraints" or that the restraints impeded Deck "from participating in the proceedings." *State v. Deck*, 136 S.W. 3d 481, 485 (Mo. 2004) (en banc). According to the Missouri Supreme Court, however, there was evidence of a risk that Deck "might flee in that he was a repeat offender" who might have "killed his two victims to avoid being returned to custody." *Id.* The United States Supreme Court reversed, relying heavily on *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986), in which the Court had previously held that "shackling[] should be permitted only where justified by an essential state interest specific to each trial."

No such interest was identified by the trial court in *Deck*. The Supreme Court's previous holdings in shackling cases had been limited to the guilt phase, as opposed to Deck's shackling, which occurred during the penalty phase. *Deck*, 544 U.S. at 630. In extending the scope of the anti-shackling rule, the *Deck* Court reasoned that the "three fundamental legal principles" that militate against the routine use of visible shackles during the guilt phase of a criminal trial —(1) the presumption of innocence, (2) interference with the accused's ability to communicate with his lawyer, and (3) maintaining the dignity of the judicial process—"apply with like force to

penalty proceedings in capital cases." *Id.* at 630-33. Despite the fact that the presumption of innocence no longer applies in the penalty phase, the Court reasoned that the jury was nevertheless "deciding between life and death," and "[t]he appearance of the offender during the penalty phase in shackles . . . almost inevitably implies to a jury . . . that court authorities consider the offender a danger to the community," a factor that is "nearly always . . . relevant" in death-penalty determinations. *Id.* at 632-33.

*Deck* also reiterates a second important proposition—namely, that the visible shackling of a defendant before the jury is "inherently prejudicial." *Deck*, 544 U.S. at 635. Generally speaking, a criminal defendant who attacks a verdict against him must show not only that an error occurred at trial, but also that the error was prejudicial to his defense. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (holding that a showing of prejudice is generally required in the context of an ineffective-assistance claim). To overcome that hurdle, "[t]he defendant must show that there is a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Id.*

But because shackling before the jury is inherently prejudicial, the burden in shackling cases shifts to the government to prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635 (alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The government may rebut the presumption of prejudice by proving that the error was harmless, however, by showing overwhelming evidence of the defendant's guilt. *Lakin v. Stine*, 431 F.3d 959, 960 (6th Cir. 2005) (applying the harmless-error test in a habeas case predicated upon a shackling claim).

### b. Deck v. Missouri *is inapplicable to the case at hand*

Keys argues that (1) the proscription against shackling a defendant in front of the jury, as outlined in *Deck*, applies to this case; and (2) because he was shackled before the jury in violation of *Deck*, that error was inherently prejudicial. Based on these two arguments, Keys claims that the Michigan Court of Appeals's decision was contrary to the federal law that *Deck* clearly established because the court stated that it "will not reverse [for shackling in front of the jury] absent a showing of prejudice." *People v. Keys*, No. 264387, 2007 WL 395104, at *3 (Mich. Ct. App. Feb. 6, 2007).

Contrary to Keys's argument, we are not at all confident that *Deck* applies to the facts of the case before us. The Court in *Deck* issued an exceedingly narrow holding: "[C]ourts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding . . . ." *Deck*, 544 U.S. 633. Although Deck was shackled during his entire resentencing proceeding (including voir dire), the Court was silent about the propriety of the practice as applied specifically to the voir dire phase of that proceeding, focusing instead on the fact that Deck was shackled "throughout the penalty phase." *Id.* at 634 (quoting *State v. Deck*, 136 S.W. 3d 481, 485 (Mo. 2004) (en banc)). Furthermore, unlike the defendant in *Deck*, Keys appeared before the jury in shackles due to an inadvertent mistake rather than by court order, and Keys's shackling was relatively brief (less than 90 minutes) as compared to Deck's.

Keys's argument that *Deck* is applicable despite these distinctions would be stronger if this case were before us on direct review. The logical underpinnings of *Deck* arguably apply with equal force to the voir dire phase of the case, which the Supreme Court has identified as "a critical stage of the criminal proceeding." *Gomez v. United States*, 490 U.S. 858, 873 (1989); *see also Hopt v. Utah*, 110 U.S. 574, 578 (1884) ("[W]here the indictment is for a felony, the trial commences at least from the time when the work of impaneling the jury begins."). And, although Keys was shackled for a relatively brief period of time, the jury's witnessing him in restraints is arguably prejudicial regardless of the incident's brevity.

But as plausible as these lines of argument may be, they are outside the scope of this court's charge on habeas review. Granting relief at this stage is appropriate only if all fairminded jurists would agree that the Michigan Court of Appeals's decision was contrary to applicable, clearly established Supreme Court precedent. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). Based on the circumstances here, Keys has not met this high standard.

The Supreme Court has never indicated, for instance, that its proscription against shackling applies as early as voir dire, a stage at which double jeopardy has yet to attach. *See Martinez v. Illinois*, 134 S. Ct. 2070, 2072 (2014) ("Our cases have repeatedly stated the bright-line rule that jeopardy attaches when the jury is empaneled and sworn." (internal quotation marks omitted)). More importantly, this court long ago concluded that "a brief and fortuitous [viewing

of the defendant in shackles] is not prejudicial and requires an affirmative showing of prejudice by the defendant." *Kennedy v. Cardwell*, 487 F.2d 101, 109 (6th Cir. 1973) (citing comparable cases).

There is little reason to believe that *Deck* disturbs this court's earlier ruling, as evidenced by numerous post-*Deck* district court opinions that continue to cite the pre-*Deck* cases for the proposition that defendants must make an affirmative showing of prejudice when jurors briefly view them in shackles. *See, e.g.*, *Jalowiec v. Bradshaw*, No. 1:03 CV 0645, 2008 WL 312655, at *58 (N.D. Ohio Jan. 31, 2008) ("[W]hen the jurors' view of the defendant in custody was brief, inadvertent, and outside the courtroom, the risk of prejudice is slight."), *aff'd*, 657 F.3d 293 (6th Cir. 2011); *Frye v. Warden, San Quentin State Prison*, No. 2:99–cv–0628 KJM CKD, 2015 WL 300755, at *78 (E.D. Cal. Jan. 22, 2015) ("Where a defendant was seen shackled in the courtroom for a significant period of time, courts have found the shackling 'inherently prejudicial' . . . . However, if the defendant was seen shackled outside the courtroom or was seen shackled in the courtroom only briefly, prejudice has not been presumed and the petitioner must prove he was actually prejudiced." (citations omitted)). For these reasons, not all fairminded jurists would agree that the Michigan Court of Appeals's decision was contrary to clearly established federal law. Habeas relief would thus be inappropriate on Keys's shackling claim.

### 2.    *Appellate counsel did not provide constitutionally ineffective assistance by failing to investigate the shackling issue on direct appeal*

Keys's final claim is that his attorney on direct appeal was constitutionally ineffective. In order to prevail on this claim, Keys must show that his appellate counsel was (1) objectively unreasonable in failing to pursue nonfrivolous issues on appeal, and (2) that the failure was prejudicial (i.e., that but for his attorney's mistake, he would have prevailed on appeal). *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

The specific error that Keys raises is his appellate counsel's alleged failure to "investigate [the shackling issue] and provide the [state] appellate court with the information required to make this a winning issue." Keys argues that, had his attorney "properly investigated" the shackling claim, the attorney would have uncovered the "clear evidence that the jury saw Keys in shackles," evidence that Keys has now "presented in affidavit form on postconviction review."

The affidavits, however, do little to advance Keys's argument. Like the state trial court before it, the Michigan Court of Appeals assumed that the jury had viewed Keys in shackles, yet it nonetheless determined that Keys was not prejudiced as a result. *People v. Keys*, No. 264387, 2007 WL 395104, at *3 (Mich. Ct. App. Feb. 6, 2007).

The affidavits thus provide no evidence to undercut the Michigan Court of Appeals's conclusion because no juror said that his or her vote to convict Keys was influenced by seeing Keys in shackles. Furthermore, even if the Michigan Court of Appeals had determined that the affidavits established prejudice, the outcome would have remained unchanged due to the overwhelming evidence of Keys's guilt. Habeas relief is thus inappropriate because Keys has failed to show that his appellate counsel's alleged error was outcome determinative.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

——————————

**CONCURRENCE**

——————————

KETHLEDGE, Circuit Judge, concurring.　No two cases present identical facts, and thus every application of a Supreme Court rule is in a sense an extension of it.　In *White v. Woodall*, 134 S. Ct. 1697 (2014), however, the Court made clear that we can grant the writ only if the state courts unreasonably apply a Supreme Court rule, not if they unreasonably refuse to extend it. Thus, in habeas cases, we must draw a line between applications of Supreme Court rules and extensions of them.

That said, "the difference between applying a rule and extending it is not always clear." *Id*. at 1706 (alterations and interior quotation marks omitted).　In most habeas cases, the question is simply *how* a particular rule—say, the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984)—applies to the facts of the case.　But in some cases the question is *whether* the rule should apply to those facts in the first place.　As I read *Woodall*, if a fairminded jurist could hold that a rule should not apply to a set of facts, then the case calls for an extension of the rule and the state courts were free not to apply it.　Our recent decision in *Drummond v. Houk*, ___ F.3d ___ (6th Cir. 2015)—which involved the question whether the Supreme Court's rules governing full-closures of a courtroom to the public apply when a closure is only partial— provides an example.

Whether Keys's case calls for an application of the holding from *Deck v. Missouri*, 544 U.S. 622 (2005), or an extension of it, is a close question.　The question, specifically, is whether Keys is entitled to *Deck*'s presumption of prejudice on grounds that he was shackled for 90 minutes during voir dire for his trial.　*Deck* itself was a penalty-phase case, but relied on guilt-phase cases throughout.　And our court has already made clear in a habeas case that *Deck*'s presumption of prejudice applies as much to shackling during the guilt phase as it does to shackling during the penalty phase.　*See, e.g., Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008).　The weak spot in Keys's argument, however, is his assumption that we should treat voir dire as part of the guilt phase for purposes of *Deck*'s presumption.　A fairminded jurist could think otherwise:　of the three factors that underlay *Deck*'s presumption, at least one of them—

"the accused's ability to communicate with his lawyer[,]" 544 U.S. at 631 (internal quotation marks omitted)—is likely less important during voir dire than during the evidentiary phases of trial. For a criminal defendant's comments to his lawyer are likely more useful during, say, the testimony of a confederate, than they are during jury selection. And one might at least argue that another factor—the presumption of innocence, *id*. at 630—is less implicated during jury-selection than it is when the jury is actually determining the defendant's guilt. Throw in that Keys was shackled only for 90 minutes during voir dire, and a fairminded jurist could conclude that Keys was not entitled to the same presumption of prejudice that a defendant shackled throughout the entire guilt phase would be. Keys therefore seeks an extension of *Deck*'s holding rather than an application of it, which under *Woodall* means the district court properly denied relief.

With these observations, I join our court's opinion in full.